******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STEPHEN BIRKHOLD *v.* SUSAN BIRKHOLD
## (SC 20593)

Robinson, C. J., and D'Auria, Mullins, Ecker and Keller, Js.

*Syllabus*

The plaintiff, whose marriage to the defendant had been dissolved, appealed from the trial court's postdissolution decision to grant the plaintiff's motion for modification of alimony and the defendant's motion for contempt, and to award the defendant past due alimony and attorney's fees. When the parties' marriage was dissolved in 2009, the plaintiff was employed as the chief executive officer of a major corporation and was paid a base annual salary and bonuses. The parties' separation agreement, which had been incorporated into the judgment of dissolution, required the plaintiff to pay the defendant alimony in the amount of 30 percent of his "gross annual base income from employment" and 25 percent of his gross cash bonus. The plaintiff subsequently left that corporation and, in 2015, began working as a commercial real estate broker for C Co. Under C Co.'s compensation plan, the plaintiff received annual draws on future commissions, initially in the amount of $35,000 a year, and, if he did not earn commissions sufficient to cover the draws, he was obligated to pay the difference back to C Co. The plaintiff elected to have the draws deposited into a bank account in the name of a limited liability company, S Co., that he had created in 2014. The plaintiff also deposited into that account money he earned in connection with certain consulting work he performed on the side. The plaintiff notified the defendant when his employment at C Co. began, and she initially agreed to accept monthly alimony in the amount of $875, or 30 percent of the $35,000 annual draw. The plaintiff, however, continued to pay her only $875 per month, even though his annual draw rate increased significantly between 2015 and 2019. In response, the defendant filed her motion for contempt and sought payment of accrued, unpaid alimony that purportedly was owed under the separation agreement. The plaintiff, on the other hand, sought to modify his alimony obligation due to a substantial change in circumstances relating to the nature of his employment with C Co. After a hearing, the trial court granted both motions and awarded the defendant past due alimony and attorney's fees. With respect to the plaintiff's motion to modify his alimony obligation, the court replaced the requirement under the separation agreement that he pay the defendant 30 percent of his gross annual base income from employment with a fixed alimony obligation of $6500 per month. The court also found the plaintiff in contempt for wilfully violating his alimony obligation under the separation agreement. On appeal from the trial court's decision, *held*:

1. The plaintiff could not prevail on his claim that the trial court incorrectly had interpreted the separation agreement and found that the money the plaintiff received from C Co. in the form of draws constituted income that was subject to alimony: the agreement's clear and unambiguous definition of "gross annual base income from employment" was without limitation and included income the plaintiff actually received as compensation for, or by reason of, past, present or future employment, from any and all sources, and nothing in the agreement indicated that it contemplated the payment of alimony derived from traditional salary income but not from commissions or consulting fees; moreover, although the term "income" was not defined in the separation agreement, and, therefore, that term was ambiguous, the trial court's determination that the plaintiff's draws from C Co. constituted income was not clearly erroneous, as the draws were clearly from his employment as a real estate broker, they were listed as payroll when deposited into S Co.'s bank account, the plaintiff reported the draws as gross income on his personal tax returns, C Co. referred to the plaintiff as an employee and to his income as earnings on its pay statements, the plaintiff would have to pay back unearned draws if his employment relationship with C Co., he presented no evidence about how he earned commissions or about whether C Co. ever recovered, demanded or threatened to recover unearned draws from him such that the draws should be treated as

loans rather than income, and he treated the money he received from C Co. as income in every relevant way, except to pay alimony to the defendant; furthermore, the trial court's skepticism toward the plaintiff's calculation of his alimony obligation under the separation agreement after he started working for C Co. was well founded, as the defendant failed to established how he earned his commissions, how much of them were applied to his draws, and why he did not pay alimony on commissions he earned.

2. The trial court correctly interpreted the separation agreement and treated the money the plaintiff earned from C Co. and from other entities as a consultant, which ultimately was deposited into S Co.'s bank account, as the plaintiff's personal income that was subject to alimony: the trial court's factual findings that the plaintiff treated the money he earned at C Co. and for his consulting work as his own income and that such earnings constituted income subject to alimony were not clearly erroneous because, although the plaintiff chose to have his draws from C Co. and the money he earned from consulting deposited into S Co.'s bank account, he could not structure the receipt of his income and use the corporate form to avoid his alimony obligation; moreover, many of S Co.'s claimed business deductions appeared to be personal expenses, S Co.'s actual business activities appeared to consist only of taking money received by the plaintiff and finding ways to claim deductions and expenses to shelter or hide it from the defendant, and nothing in the separation agreement addressed business related expenses; furthermore, although it may be advantageous for tax purposes to set up a limited liability company, such as S Co., that fact had no bearing on the determination of whether income is properly subject to alimony.

3. The trial court did not abuse its discretion in modifying the plaintiff's alimony obligation by requiring the plaintiff to pay to the defendant a fixed amount of $6500 per month: contrary to the plaintiff's claim that the trial court considered only his past gross income and improperly modified his alimony obligation on the basis of an earning capacity not supported by the record, the court considered all of the statutory (§ 46b-82 (a)) factors that a court must consider in determining an alimony award and found that there had been a change of circumstances that necessitated a modification to the plaintiff's alimony obligation, namely, that the plaintiff became a consultant and an independent contractor with much more complicated finances, that his base salary was reduced and his bonuses eliminated, and that he remarried and relocated to a state without any state income tax; moreover, the record contained sufficient evidence to support the court's findings regarding the plaintiff's earning capacity, the court based its decision on the income of both parties and their income earning potential, and its order provided for a second look at the plaintiff's alimony obligation when he reached the age of sixty-five; furthermore, the court expressly noted that its alimony determination was based on a net earning capacity of $250,000, which was markedly less than the plaintiff's past gross annual income of $350,000.

4. The trial court did not abuse its discretion in finding the plaintiff in contempt for breaching his alimony obligation to the defendant: it was sufficiently clear from the terms of the separation agreement that the plaintiff was required to pay alimony on commissions he earned and on other consulting income, he did not pay such alimony, and it was untenable to conclude that he did not wilfully fail to fully comply with his obligation under the separation agreement to pay alimony on the basis of his gross annual base income from employment, in whatever form received and from any and all sources, including commissions and consulting income paid to him or deposited into S Co.'s bank account; moreover, it was abundantly clear that this failure to comply did not involve a good faith dispute or legitimate misunderstanding, as the plaintiff engaged in self-help by unilaterally reducing his alimony obligation when he first began his employment with C Co., and he sought court approval to modify that obligation only after the defendant moved for contempt; furthermore, the fact that the plaintiff informed the defendant, when the plaintiff started working for C Co., that he was adjusting his alimony payments due to the complicated nature of the payment structure at C Co. should have alerted him to the need to seek the advice of the court concerning the future calculation of his alimony obligation, and the plaintiff's concession that he did not pay alimony on his commissions and income from his consulting work undermined any contention

that any ambiguity concerning his alimony obligation entitled him to resort to self-help rather than seeking the advice of the court.

Argued February 16—officially released June 28, 2022

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the court, *Pinkus*, *J.*, rendered judgment dissolving the marriage and granting certain other relief in accordance with the parties' separation agreement; thereafter, the court, *Wenzel*, *J.*, granted the defendant's motion for contempt and granted in part the plaintiff's motion for modification, and the plaintiff appealed. *Affirmed.*

*Charles D. Ray*, with whom, on the brief, were *Brittany A. Killian* and *Angela M. Healey*, for the appellant (plaintiff).

*Alexander Copp*, with whom was *Rachel A. Pencu*, for the appellee (defendant).

*Opinion*

D'AURIA, J. In this appeal, we are called on to interpret a separation agreement to determine whether draws or advance payments on commissions are loans, and thus do not constitute income for the purposes of awarding alimony. The plaintiff, Stephen Birkhold, appeals from the trial court's decision granting both his motion for modification of alimony and a postjudgment motion for contempt filed by the defendant, Susan Birkhold, which the trial court resolved by finding the plaintiff in contempt and awarding the defendant past due alimony and attorney's fees. On appeal, the plaintiff claims that the trial court incorrectly (1) interpreted the parties' separation agreement to conclude that the draws from his employment as a real estate broker were income subject to alimony, (2) interpreted the parties' agreement to conclude that money paid to his limited liability company (LLC) was income subject to alimony, (3) modified his future alimony obligation, (4) found him in contempt for his failure to pay alimony, and (5) awarded the defendant attorney's fees as the prevailing party under the separation agreement.[1] We affirm the trial court's decision in full.

The record reveals the following procedural history and facts found by the trial court. The court dissolved the parties' marriage in 2009. The court's dissolution judgment incorporates a separation agreement the parties had negotiated that requires the plaintiff to pay alimony to the defendant in an amount equal to "30 percent of his 'gross annual base income from employment' as defined herein . . . and 25 percent of his gross cash bonus . . . ." The separation agreement defines "gross annual base income from employment" as "income actually received by the [plaintiff] from employment . . . from any and all sources derived. Without limiting the generality of the foregoing, 'gross annual base income from employment' shall include income from wages, salaries, consulting or other fees, commissions, director's fees and compensation for or by reason of past, present or future employment, in whatever form received." The separation agreement further provides that, in the event a court determines that either party has breached any of the provisions of the agreement, "the offending party shall pay to the other party reasonable [attorney's] fees, court costs and other expenses incurred in the enforcement of the provisions of this [a]greement and/or judgment or decree incorporating any or all of the provisions hereof."

At the time of dissolution, the plaintiff was the chief executive officer of a major corporation. He was paid an annual salary and a bonus, and received a W-2 form for tax purposes. Although the plaintiff changed jobs after the divorce, he remained a highly compensated corporate executive, earning more than $2 million a year in 2013 and 2014. Pursuant to the parties' agree-

ment, the defendant received 30 percent of his earnings, all of which was paid as base income during those years. The plaintiff was then unemployed for almost one year.

In 2015, the plaintiff informed the defendant that he had begun working for Cushman & Wakefield as a commercial real estate broker. He would receive annual draws on future commissions, initially in the amount of $35,000 a year, which he claimed he did not earn until he realized sales that resulted in commissions. The plaintiff stated that the purpose of the draw was to provide him with medical insurance. If the plaintiff did not earn commissions sufficient to cover the draw, his employment agreement obligated him to pay the difference back to Cushman & Wakefield. Two weeks after beginning at Cushman & Wakefield, the plaintiff offered to pay the defendant $875 a month (30 percent of the $35,000 draw) in alimony as long as the defendant agreed that she would pay him back if he did not earn his draw. The defendant agreed to accept the $875 a month alimony payment because she was "in a very difficult financial predicament [at that time], and even that small amount [would] aid in paying utilities."

In subsequent years, the plaintiff's annual draw rate increased. The plaintiff's total compensation from Cushman & Wakefield was $175,900 in 2016, $315,777 in 2017, $216,105 in 2018, and $138,534 in 2019. The plaintiff also received other payments as a business consultant to other entities during this time, totaling $630,930. Despite the increase in the draw rate and his other consulting income, the plaintiff continued to pay the defendant only $875 a month in alimony.

In 2017, the defendant filed a postjudgment motion for contempt and, later, in 2018, an amended motion for contempt for the plaintiff's failure to pay alimony consistent with the separation agreement. In addition to a finding of contempt, the defendant sought an order compelling the plaintiff to pay her the accrued unpaid alimony that she claimed was owed under the separation agreement. Thereafter, the plaintiff filed a motion to modify his alimony obligation due to a substantial change of circumstances in the nature of his employment. Specifically, the plaintiff contended that the definition of "gross income" was no longer equitable because his "income through Cushman & Wakefield is subject to 'claw-back' provisions," and he is required to make business expenditures to generate income that are not accounted for in the current definition of gross annual base income from employment.

Following a multiday evidentiary hearing, the trial court issued a memorandum of decision and awarded the defendant past due alimony as of October 1, 2019, in the amount of $249,570 to be paid in $3500 monthly installments,[2] and attorney's fees and costs in the amount of $80,000, to be paid in $4000 monthly installments. The trial court also granted the plaintiff's motion

to modify his alimony obligation by eliminating the 30 percent of gross annual base income from employment formula and replacing it with a fixed monthly alimony obligation of $6500 per month.[3] The trial court also found the plaintiff in contempt for wilfully violating the "clear and unambiguous" separation agreement.

The plaintiff appealed to the Appellate Court, and the appeal was transferred to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.[4] Additional facts and procedural history will be provided as needed.

I

On appeal, the plaintiff claims that the trial court premised its decision awarding the defendant past due alimony on an incorrect reading of the separation agreement and a clearly erroneous finding that money he received from his work as a real estate broker for Cushman & Wakefield in the form of a draw constituted income subject to alimony under that agreement. The plaintiff argues that, because the agreement does not state or imply that gross annual base income from employment includes money received but subject to repayment, the draws are not "income actually received," as contemplated by the separation agreement, until he earns the commission. The money, the plaintiff contends, is a loan requiring repayment and therefore cannot properly be considered income for the purposes of determining alimony. The defendant responds that the trial court's finding that the draws were income and not a series of loans was not clearly erroneous. We agree with the defendant.

The interpretation of a separation agreement "incorporated into a dissolution decree is guided by the general principles governing the construction of contracts." (Internal quotation marks omitted.) *Eckert* v. *Eckert*, 285 Conn. 687, 692, 941 A.2d 301 (2008). When the language of a contract is clear and unambiguous, the contract "must be given effect according to its terms, and the determination of the parties' intent is a question of law." (Internal quotation marks omitted.) *Nation-Bailey* v. *Bailey*, 316 Conn. 182, 192, 112 A.3d 144 (2015). "When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact." (Internal quotation marks omitted.) Id.

"When construing a contract, we seek to determine the intent of the parties from the language used interpreted *in the light of the situation of the parties and the circumstances connected with the transaction. . . .* [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." (Emphasis in original; internal quotation marks omit-

ted.) *Isham* v. *Isham*, 292 Conn. 170, 180, 972 A.2d 228 (2009).

We agree with the trial court's conclusion that the clear and unambiguous definition of gross annual base income from employment included income from self-employment or as an independent contractor. The definition of gross annual base income from employment provided by the separation agreement "is expressly stated to be without limitation" and includes income "actually received" by the plaintiff from employment as "compensation for or by reason of past, present or future employment, in whatever form received," and from "any and all sources derived." Some examples of gross annual base income from employment, like consulting fees, commissions, and director's fees, "might be reported as either W-2 wages or 1099s."No language in the separation agreement "suggests the form of reporting income should control which income is recognized for the purpose of alimony computation," and, therefore, the trial court correctly rejected the argument that the separation agreement contemplated the plaintiff paying alimony derived only from traditional W-2 salary.

Although the trial court never said so, the term "income" is ambiguous; its meaning in any particular case will depend on the surrounding context. The separation agreement defines "gross annual base income from employment" but does not define "income." We previously have observed that "income" is defined broadly, particularly in family cases. See *Unkelbach* v. *McNary*, 244 Conn. 350, 360–61, 710 A.2d 717 (1998). This is consistent with our approach of "includ[ing] in income items that increase the amount of resources available for support purposes." Id., 360. Indeed, we have held that, even gifts, if received regularly and consistently, "whether in the form of contributions to expenses or otherwise, are properly considered in determining alimony awards to the extent that they increase the amount of income available for support purposes." Id., 360–61.

For example, Black's Law Dictionary defines "income" as "[t]he money or other form of payment that one receives, usu[ally] periodically, from employment, business, investments, royalties, gifts, and the like." Black's Law Dictionary (11th Ed. 2019) p. 912. Another dictionary defines "income" as "something that comes in as an increment or addition usu[ally] by chance . . . a gain or recurrent benefit that is usu[ally] measured in money and for a given period of time, derives from capital, labor, or a combination of both, includes gains from transactions in capital assets, but excludes unrealized advances in value: commercial revenue or receipts of any kind except receipts or returns of capital . . . ." Webster's Third New International Dictionary (2002) p. 1143; see also *Gay* v. *Gay*, 70 Conn. App. 772, 778, 800

A.2d 1231 (2002) (quoting definition in Webster's Third New International Dictionary to determine meaning of "income," as used in General Statutes § 46b-82), aff'd, 266 Conn. 641 835 A.2d 1 (2003).

Despite the generally expansive meaning of the term, not every receipt of funds will be considered income.[5] Perhaps most prominently, a loan is "not an [asset] but a liability" and cannot properly be considered income to determine alimony. *Schmidt* v. *Schmidt*, 180 Conn. 184, 188, 429 A.2d 470 (1980).

Because of the broad but not limitless definition of income, appellate courts often hold that, when a separation agreement provides no definition of income, the term is ambiguous. See, e.g., *Marcus* v. *Marcus*, 175 Conn. 138, 141, 394 A.2d 727 (1978) (term "income" is ambiguous when undefined in separation agreement); *Baldwin* v. *Baldwin*, 19 Conn. App. 420, 422, 562 A.2d 581 (1989) (same). It is, therefore, unsurprising that, historically, the question of "[w]hether money should be characterized as income or a loan is a question of fact for the trial court." *Keller* v. *Keller*, 167 Conn. App. 138, 152, 142 A.3d 1197, cert. denied, 323 Conn. 922, 150 A.3d 1151 (2016); see also *Zahringer* v. *Zahringer*, 262 Conn. 360, 369–71, 815 A.2d 75 (2003).[6] Although the plaintiff is correct that, as a matter of law, loans are not income that a court may consider in determining alimony, this rule is implicated only if a court first makes the factual finding that the money at issue is indeed a loan.

Because the parties' separation agreement in the present case does not define the term "income," we conclude that it is susceptible to more than one reasonable interpretation and is therefore ambiguous. This conclusion is reinforced, rather than undermined, by the text of the separation agreement, which provides that gross annual base income from employment includes "income actually received" from any and all sources, and encompasses income from wages, salary, consulting fees, commissions, director's fees, "and compensation for or by reason of past, present or future employment, in whatever form received." Accordingly, we apply the clearly erroneous standard of review to the trial court's factual determination that the plaintiff's draws from Cushman & Wakefield were income. A finding of fact is clearly erroneous when no evidence in the record supports it "or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Remillard* v. *Remillard*, 297 Conn. 345, 356, 999 A.2d 713 (2010).

There is ample evidence in the record that supports the trial court's finding that the money received by the plaintiff from Cushman & Wakefield in the form of a draw was includable as gross annual base income from

employment. The trial court found that the moneys from Cushman & Wakefield "were clearly from employment," regardless of "whether they were currently earned or still subject to repayment." The draws were paid for the plaintiff's services as a commercial real estate broker at Cushman & Wakefield. He received semimonthly deposits, listed as "C & W Inc. 1099 Payroll," to his LLC bank account. The plaintiff reported the draws as "gross income" on his personal tax returns. Cushman & Wakefield referred to the plaintiff as an "employee," and to his income as "earnings," on a 2019 pay statement, and noted that he would have to pay back unearned draws "[i]n the event [his] *employment* or relationship" with Cushman & Wakefield ended. (Emphasis added.)

Although the plaintiff presented evidence in the form of draw agreements and promissory notes with Cushman & Wakefield, and testified that the draws were loans, he presented no evidence about how he actually earned his commissions and no evidence that Cushman & Wakefield, in fact, "ever did recover, demand or even threaten to recover unearned draws." Even when the plaintiff did earn commissions, he "did not pay alimony to the [defendant] based on such funds." Rather, the trial court found that the plaintiff treated the money from Cushman & Wakefield as income "in every relevant way," except to pay alimony to the defendant, such as reporting his draws as "gross income" on his personal tax returns. As the trial court observed, "[w]hile there was a continuing dispute over the issue of whether . . . the [defendant] would agree to repay the alimony she received based on draws from [Cushman & Wakefield] if [the draws] were recouped by [Cushman & Wakefield] as unearned, the [plaintiff] recognized [that] the payments to her would reflect the amounts of such payments from [Cushman & Wakefield]." (Footnote omitted.) The trial "court, as the trier of fact and thus the sole arbiter of credibility, was free to accept or reject, in whole or in part, the testimony offered by either party." (Internal quotation marks omitted.) *Remillard* v. *Remillard*, supra, 297 Conn. 357.

Consistent with the parties' intent at the time they signed the separation agreement, as evidenced by their having provided a very broad definition of gross annual base income from employment, the defendant clearly expected some form of alimony so long as the plaintiff was employed. For the first four months after the divorce, the separation agreement required the plaintiff to pay $11,750 a month in alimony. After those four months, the separation agreement required the plaintiff to pay 30 percent of his gross annual base income from employment, up to $600,000—meaning, a maximum of $15,000 a month (if he did not receive a bonus). And, indeed, for years, the plaintiff paid the defendant thousands of dollars a month in alimony. Although the law and the separation agreement account for changes in circumstances, the plaintiff, as the moving party, is

required to "demonstrate that circumstances have changed since the last court order such that it would be unjust or inequitable to hold either party to it." (Internal quotation marks omitted.) *Olson* v. *Mohammadu*, 310 Conn. 665, 672, 81 A.3d 215 (2013). The plaintiff's interpretation that he was required to pay the defendant only $875 a month in alimony would be a dramatic departure from the agreement they negotiated, and, therefore, he bore the burden of proving a change of circumstances to justify a new order. In the end, the trial court did not hold the plaintiff to the expectation that he pay tens of thousands of dollars a month in alimony, even if the defendant thought she would be receiving the higher amount she was accustomed to in the years immediately following the parties' divorce. After hearing evidence, the trial court was constrained to observe that the plaintiff had failed to establish how he earned his commissions, why his purported debt to Cushman & Wakefield fluctuated, how much of his commissions were applied to his draws, and why the plaintiff did not pay alimony on commissions he earned. The trial court's skepticism toward the plaintiff's calculation of his alimony obligation in light of his new arrangement was well founded. We conclude that the trial court correctly interpreted the parties' separation agreement and that its findings were not clearly erroneous.

II

The plaintiff next claims that the trial court also premised its decision on the amended motion for contempt on an incorrect interpretation of the parties' separation agreement and a clearly erroneous finding that money earned by and paid to his LLC was his personal income and subject to alimony. The plaintiff argues that the money paid to the LLC was not income subject to his alimony obligation because it was not received by him, and, alternatively, any money the LLC received is subject to business related expense deductions. The plaintiff contends that, although he rendered services on behalf of the LLC, that does not make the resulting income paid to the LLC the plaintiff's personal income. The defendant responds that the record supports the trial court's finding that the money from Cushman & Wakefield and other entities was income to the plaintiff and not the LLC. We agree with the defendant.

Interpretation of an ambiguous contract is a question of fact. E.g., *Nation-Bailey* v. *Bailey*, supra, 316 Conn. 192. A finding of fact is clearly erroneous when no evidence in the record supports it or when the reviewing court is "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Remillard* v. *Remillard*, supra, 297 Conn. 356.

Due to the ambiguity in the term "income," we also must determine whether the trial court was correct

about whether payments to the LLC fell within the scope of that definition. In 2014, the plaintiff created a limited liability company called SNB NYC Consulting, LLC. He was a 50 percent member of the LLC with his new wife until 2019; he is now the sole member. Since 2017, the plaintiff has elected to have the LLC taxed as an S corporation.[7] The plaintiff similarly chose to have his Cushman & Wakefield draws and money earned from other consulting services deposited into the LLC's account. We agree with the trial court that the plaintiff cannot structure the receipt of his income and use the corporate form to avoid his alimony obligation. As the trial court found, "[w]hile such manipulations may have yielded tax benefits to the [plaintiff], there was no evidence [they] were necessary to earn this income." The trial court specifically found that "[m]any of the claimed business deductions by [the LLC] appeared to be entirely personal expenses of the [plaintiff] and his new wife. More importantly, the actual business activities of [the LLC] appear to consist only of taking moneys already received by the [plaintiff] and finding ways to claim deductions and expenses to shelter this income and/or hide it from the [defendant]." Also, nothing in the separation agreement addresses business related expenses. These facts, as found by the trial court, are not clearly erroneous and support the court's determination that the LLC was used to shield the plaintiff's income from his alimony obligations, that the income was properly subject to alimony, and that the plaintiff was not entitled to business expense deductions.

The fact that it may be advantageous for tax purposes to set up an LLC has no bearing on the determination that the income is properly subject to alimony. Our decision in *Tuckman* v. *Tuckman*, 308 Conn. 194, 61 A.3d 449 (2013), is instructive. In *Tuckman*, the defendant challenged the trial court's determination that, when fixing alimony and child support, her taxable income from an S corporation[8] should be included in her annual net income. Id., 208–209. This court, in considering how to treat "the retained earnings of an S corporation that are passed through to a shareholder for purposes of measuring and imposing a child support obligation," followed the Massachusetts Supreme Judicial Court's decision in *J.S.* v. *C.C.*, 454 Mass. 652, 662–63, 912 N.E.2d 933 (2009), which concluded that "[t]he better reasoned decisions require a [case specific], factual inquiry and determination . . . . We follow the lead of these cases, and similarly conclude that a determination whether and to what extent the undistributed earnings of an S corporation should be deemed available income to meet a child support obligation must be made based on the particular circumstances presented in each case. Such a [fact based] inquiry is necessary to balance, inter alia, the considerations that a [well managed] corporation may be required to retain a portion of its earnings to maintain corporate operations

and survive fluctuations in income, but corporate structures should not be used to shield available income that could and should serve as available sources of child support funds." (Internal quotation marks omitted.) *Tuckman* v. *Tuckman*, supra, 210–11. In *Tuckman*, this court detailed some relevant factors trial courts should weigh "in determining what portion of undistributed corporate earnings may be available to a shareholder for a child support obligation": (1) the shareholder's level of control over corporate distributions, as measured by the shareholder's ownership interest, (2) legitimate business interests justifying retained corporate earnings, and (3) evidence of an attempt to shield income by means of retained earnings. Id., 211. In the present case, to determine that the earnings deposited in the plaintiff's LLC account were attributable to him as income under the separation agreement, the trial court properly conducted just such a fact based inquiry.

The plaintiff relies on *Yomtov* v. *Yomtov*, 152 Conn. App. 355, 98 A.3d 110 (2014), in which the Appellate Court held that, because an LLC is a "distinct legal entity whose existence is separate from its members"; (internal quotation marks omitted) id., 362; income must be actually received by the plaintiff, and not the LLC, to be properly subject to alimony obligations. The defendant argues that *Yomtov* is distinguishable because, in that case, there was no dispute that the money in question was initially gross revenue to the LLC and the LLC existed at the time the parties signed their separation agreement, whereas, in the present case, the trial court was not required to accept the plaintiff's claim that the LLC earned revenue separate from his own income.

The plaintiff's reliance on *Yomtov* is unpersuasive. At best, *Yomtov* can be understood to stand for the proposition that income the LLC received *may* be properly considered separate and distinct from its members' income. But, as *Tuckman* instructs, that determination is undertaken on a case-by-case basis after the trial court's careful consideration of the parties' circumstances. As the Appellate Court noted in *Yomtov*, "the circumstances of the parties at the time of the dissolution do not support the contention that the plaintiff's income is that of his limited liability company." Id., 363. In the present case, however, the trial court made the factual finding that the plaintiff treated as his own income the money received for work conducted for Cushman & Wakefield, as well as other consulting work, even if deposited into the LLC's account. The trial court concluded that the parties' circumstances at the time of dissolution confirms that the separation agreement "was intended to be broad and include all forms of income" and, therefore, was not limited to "traditional executive compensation in the form of W-2 reported income." The fact that the plaintiff elected to operate as an LLC cannot justify the nonpayment of alimony,

even if being an S corporation may have permitted him to treat the income differently if the choice had not been his. Thus, we conclude that the trial court correctly interpreted the parties' separation agreement, and its findings were not clearly erroneous.

### III

The plaintiff also claims that the trial court incorrectly modified his future alimony obligation based on a net annual income and earning capacity not supported by the record. He argues that the trial court did not take into account all relevant statutory criteria and that the only factor the court considered was his past gross income. The defendant responds that the trial court did not abuse its discretion because the record supports the alimony award. She also notes that the trial court's memorandum of decision expressly states that the court considered all relevant statutory factors, and there is no requirement that it use a precise formula to calculate available net income. We agree with the defendant.

Addressing the plaintiff's motion for modification, the trial court found that there had indeed been a substantial change in circumstances that necessitated a modification to the plaintiff's alimony obligation. Specifically, after considering all the factors required by § 46b-82,[9] the court found (1) a substantial reduction in the plaintiff's income from his base salary of $470,000 with annual bonuses as a senior corporate executive to an average gross income of approximately $350,000 with no bonus income during the fifty-one months from mid-2015 to September, 2019, and an annualized income of $311,000 for the first nine months of 2019, (2) that he had remarried,[10] (3) that he had relocated twice, and (4) that he is became a consultant and independent contractor with much more complicated financial affairs. Although $350,000 represents the plaintiff's average past gross income, the trial court based its alimony award on a net earning capacity of at least $250,000, taking into consideration the factors required by § 46b-82 and that his new residence of Texas has no state income tax.[11] The trial court also found that the parties appeared to be in good health and that there were established financial records pertaining to the parties' income and income earning potential. The trial court then declined the plaintiff's request to modify the separation agreement to have his alimony determined by net income rather than gross income because the plaintiff had structured his financial affairs "in such a way as to minimize his tax obligations, as well as his obligations to pay alimony. . . . The court believes that modification of the agreement to allow [him] to claim and deduct expenses would invite misadventures by [the plaintiff] and inevitably lead to future disputes . . . . This is simply not the formula which was originally negotiated by the parties." (Footnote omitted.) Minimizing future conflict—not to mention litigation—

is itself an appropriate exercise of discretion. See, e.g., *Pasquariello* v. *Pasquariello*, 168 Conn. 579, 584, 362 A.2d 835 (1975) ("trial courts have a distinct advantage over an appellate court in dealing with domestic relations, where all of the surrounding circumstances and the appearance and attitude of the parties are so significant" (internal quotation marks omitted)). The trial court therefore went on to modify the alimony provisions of the separation agreement so that the plaintiff now pays the defendant a flat $6500 a month, as opposed to an amount based on a specific formula, with the parties being entitled to a "second look" following the plaintiff's sixty-fifth birthday.

"An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Morris* v. *Morris*, 262 Conn. 299, 305, 811 A.2d 1283 (2003). "To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous." (Internal quotation marks omitted.) *Light* v. *Grimes*, 156 Conn. App. 53, 64, 111 A.3d 551 (2015). "[General Statutes §] 46b-86 governs the modification or termination of an alimony or support order after the date of a dissolution judgment. When . . . the disputed issue is alimony . . . the applicable provision of the statute is § 46b-86 (a), which provides that a final order for alimony may be modified by the trial court upon a showing of a substantial change in the circumstances of either party." (Footnote omitted; internal quotation marks omitted.) *Olson* v. *Mohammadu*, supra, 310 Conn. 671–72.

"[A] court must base child support and alimony orders on the available net income of the parties, not gross income." *Morris* v. *Morris*, supra, 262 Conn. 306. However, a "trial court may under appropriate circumstances in a marital dissolution proceeding base financial awards [pursuant to §§ 46b-82 (a) and 46b-86] on the earning capacity of the parties rather than on actual earned income. . . . Earning capacity, in this context, is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health. . . . When determining earning capacity, it . . . is especially appropriate for the court to consider whether [a person] has wilfully restricted his [or her] earning capacity to avoid support obligations." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Tanzman* v. *Meurer*, 309 Conn. 105, 113–14, 70 A.3d 13 (2013). It is also

appropriate to consider a party's earning capacity when there is evidence of that party's previous earnings. See, e.g., *Miller* v. *Miller*, 181 Conn. 610, 612–13, 436 A.2d 279 (1980).

Sufficient evidence in the record supported the trial court's findings regarding the plaintiff's earning capacity such that its award of a monthly alimony obligation of $6500 was not an abuse of discretion. The trial court based its modified award not only on the plaintiff's past gross earnings but also on his long and successful career as a senior executive, broker, and consultant, and his move to a state without a state income tax. The court's order specifically provided for a "second look" when the plaintiff reaches the age of sixty-five. The trial court also based its decision on the income and income earning potential of *both* parties. It could have been an abuse of discretion for the court to have based its decision solely on the plaintiff's past gross income without taking into account any other facts or circumstances whatsoever, but the trial court expressly noted that its alimony determination was anchored on the conclusion that the plaintiff's net earning capacity was $250,000, which is markedly less than his past gross annual income of $350,000 from mid-2015 to September, 2019. The trial court's alimony award of $6500 per month therefore did not amount to an abuse of discretion.

IV

The plaintiff challenges the trial court's finding of contempt against him for breaching his alimony obligation because he claims that his nonpayment was based on a good faith belief that he did not owe alimony on money received from Cushman & Wakefield and on revenue to his LLC. Specifically, he argues that the language of the separation agreement was not clear and that his actions were not wilful because he sought and relied on the advice of professional advisors. The defendant argues that the overall obligation to pay alimony in the separation agreement was clear and unambiguous, that the plaintiff's actions were wilful because he took unilateral action, and that, although he testified that he consulted with professional advisors for tax purposes, there was no evidence that he received advice related to the calculation of the amount of his alimony payments under the separation agreement. We agree with the defendant.

"It is the burden of the party seeking an order of contempt to prove, by clear and convincing evidence, both a clear and unambiguous directive to the alleged contemnor and the alleged contemnor's wilful noncompliance with that directive." *Puff* v. *Puff*, 334 Conn. 341, 365, 222 A.3d 493 (2020). The question of whether the underlying order is clear and unambiguous is a legal inquiry subject to de novo review. See, e.g., *In re Leah S.*, 284 Conn. 685, 693, 935 A.2d 1021 (2007). We review the trial court's determination that the violation was

wilful under the abuse of discretion standard. See id., 693–94.

The present case involves allegations of indirect civil contempt. "A refusal to comply with an injunctive decree is an indirect contempt of court because it occurs outside the presence of the trial court." (Internal quotation marks omitted.) *Brody* v. *Brody*, 315 Conn. 300, 317, 105 A.3d 887 (2015). "[C]ivil contempt is committed when a person violates an order of [the] court which requires that person in specific and definite language to do or refrain from doing an act or series of acts." (Emphasis omitted; internal quotation marks omitted.) *Gabriel* v. *Gabriel*, 324 Conn. 324, 333, 152 A.3d 1230 (2016).

Addressing the defendant's motion for contempt, the trial court found that "the obligation in question, to pay alimony pursuant to the [separation] [a]greement, is clear and unambiguous. The court finds that the [plaintiff] did fail to pay the amounts due, [and] such failure to pay was wilful and that both of these elements were established by clear and convincing evidence." The trial court went on to state that it could award the defendant her requested relief "independent[ly] of any finding of contempt" because the plaintiff had breached his alimony obligation under the separation agreement, and the agreement contained a fee shifting provision. See footnote1 of this opinion. Although the defendant requested $88,789 in attorney's fees, the trial court awarded her $80,000.

We conclude that the trial court did not abuse its discretion in finding the plaintiff in contempt. During the time in question, the plaintiff did not pay *any* alimony on Cushman & Wakefield commissions he in fact earned, totaling $439,919, or on other self-employment income not subject to any claim of repayment, totaling $653,639.[12] It was sufficiently clear from the terms of the separation agreement that the plaintiff had to pay alimony on commissions he did earn and other consulting income, thereby constituting independent violations to support the finding of contempt. Notwithstanding our determination that it is not clear and unambiguous from the terms of the separation agreement whether the plaintiff's draws constituted income or a loan, we also agree with the trial court that it is untenable on this record to conclude that the plaintiff did not wilfully fail to fully comply with his obligation to pay as alimony 30 percent of his gross annual base income from employment "in whatever form received" from "any and all sources derived," including consulting or commission work paid to him or to his LLC. As the trial court found, through his LLC, the plaintiff treated his income in a "byzantine and highly structured manner" to the detriment of the defendant. As a result, in the four years in question, the plaintiff earned a gross income of $1,531,900, yet he paid the defendant only

$210,000 in alimony. The plaintiff's position on appeal that it was not clear that he had to pay alimony on "income other than W-2 income" is belied by his 2015 e-mail offering to pay the defendant 30 percent of his Cushman & Wakefield draw. Yet, the plaintiff concedes that, even when his annual draw rate increased, he continued to pay the defendant only $875 a month.

Moreover, any ambiguity in the definition of "income" in the separation agreement does not affect our conclusion because it is abundantly clear that this was not a good faith dispute or legitimate misunderstanding. "A party to a court proceeding must obey the court's orders unless and until they are modified or rescinded, and may not engage in 'self-help' by disobeying a court order to achieve the party's desired end." *Hall* v. *Hall*, 335 Conn. 377, 397, 238 A.3d 687 (2020). The principle against self-help often applies in situations "in which previously compliant parties stopped complying with court orders after changes in circumstances rendered the orders unclear without first seeking judicial clarification or modification." *In re Leah S.*, supra, 284 Conn. 700.

In *Eldridge* v. *Eldridge*, 244 Conn. 523, 710 A.2d 757 (1998), this court recognized that, although contempt is " 'particularly harsh,' " a good faith dispute or legitimate misunderstanding does not preclude a finding of wilfulness as a predicate to a judgment of contempt. Id., 529. In affirming the contempt order in *Eldridge*, this court reasoned that (1) the plaintiff should have moved to modify his alimony obligation prior to unilaterally suspending periodic alimony payments, (2) the plaintiff had the ability to comply and chose not to comply, and (3) the fact that the plaintiff was *ultimately proven correct* that he was owed a credit from the defendant did not undermine the trial court's determination that the plaintiff's behavior was contemptuous. See id., 529–34. We explained in *Eldridge*: "This is not a case in which the [plaintiff] did not have the ability to comply. Rather, he chose not to. The fact that the plaintiff ultimately was proven correct in his calculations of the various debits and credits between him and the defendant does not mean . . . that the court was precluded from finding him in contempt as a matter of law. Whether to find a party in contempt is ultimately a matter within the trial court's discretion. The trial court could have exercised its discretion so as not to find the plaintiff in contempt. The fact that the plaintiff exercised self-help when he was not entitled to do so, however, by disobeying the court's order without first seeking a modification was a sufficient basis for the trial court's contrary exercise of discretion. The court was entitled to determine that to exonerate the plaintiff would be an undue inducement to litigants' exercise of self-help." (Emphasis omitted.) Id., 532.

In *Sablosky* v. *Sablosky*, 258 Conn. 713, 784 A.2d 890

(2001), this court cited *Eldridge* approvingly and concluded that, "[when] there is an ambiguous term in a judgment, a party must seek a clarification upon motion rather than resort to self-help. Id., 720. The appropriate remedy for doubt about the meaning of a judgment is to seek a judicial resolution of any ambiguity; it is not to resort to self-help." Although *Sablosky* presented the issue of child support orders, this court reasoned that it was similar to when "a party makes a motion for modification of a support order on the ground of a substantial change in circumstances. Although one party may believe that his or her situation satisfies this standard, until a motion is brought to and is granted by the court, that party may be held in contempt in the discretion of the trial court if, in the interim, the complaining party fails to abide by the support order." Id., 722.

The present case is similar to *Eldridge* and *Sablosky*. The plaintiff unilaterally reduced his alimony when he first began his employment with Cushman & Wakefield in 2015. Article V, § 5.8, of the separation agreement provides only that the "[plaintiff] shall not make an application to any [c]ourt for modification of his obligations pursuant to this [a]rticle V *on the basis of the* [*defendant's*] *income* unless she earns more than $35,000 in any year . . . ." (Emphasis added.) The separation agreement, therefore, does not prevent the plaintiff from seeking to modify his alimony obligation, as long as it is for a reason other than the defendant's income increasing, but not surpassing, $35,000 in any year. The plaintiff filed the motion to modify his alimony obligation only after the defendant filed her motions for postjudgment contempt for the plaintiff's failure to pay alimony to her as contemplated by the separation agreement for the preceding four years. In *Eldridge*, the plaintiff was explicitly directed in a prior Appellate Court decision "to seek the assistance of the court and not to engage in self-help"; *Eldridge* v. *Eldridge*, supra, 244 Conn. 531; and, therefore, we held in that case that the trial court "properly concluded that the plaintiff was not justified in his stated belief that he simply could withhold payments and . . . that his explanations were not adequate to explain his failure to obey the court order." Id., 531–32. In the present case, the fact that the plaintiff reached out to the defendant when he began his employment with Cushman & Wakefield to adjust his alimony payments because the payment structure was "a little complicated" should have alerted him to the need to seek the advice of the court concerning the future calculation of his alimony payments. We recognize that, in other cases, a party facing a potentially ambiguous court order after a change in circumstances can avoid being held in contempt due to a reasonable mistake, without first resorting to the court, by proceeding in good faith. In this case, the plaintiff crossed the line from what could have been a good

faith misunderstanding to knowingly taking advantage of an ambiguity at the expense of the defendant. The plaintiff cannot use that ambiguity to escape contempt.

Last, the plaintiff conceded that he did not pay alimony on commissions he did earn at Cushman & Wakefield, as well as on money paid to him in connection with other consulting work. This concession "seriously undermine[s] any contention that the ambiguity entitled the [plaintiff] to eschew seeking the court's advice and, instead, to resort to self-help." *Sablosky* v. *Sablosky*, supra, 258 Conn. 720–21. Accordingly, we uphold the trial court's finding of contempt.

The decision of the trial court is affirmed.

In this opinion the other justices concurred.

[1] Section 11.3 of the separation agreement provides that, "[i]n the event that it shall be determined by a court of competent jurisdiction that either party shall have breached any of the provisions of this [a]greement . . . the offending party shall pay to the other party reasonable [attorney's] fees, court costs and other expenses incurred in the enforcement of the provisions of this [a]greement . . . ." After finding both that the plaintiff breached his obligation under the agreement and violated a clear and unambiguous court order by failing to pay alimony, the trial court ruled that the defendant was entitled to recover "all her reasonable attorney's fees, court costs and expenses incurred in the enforcement of this [a]greement." The trial court then ordered the plaintiff to pay $80,000 to satisfy the defendant's attorney's fees, costs, and expenses. The trial court's exercise of discretion, although it found the plaintiff in contempt, went no further than to make the defendant whole: to get the alimony and attorney's fees that she was entitled to under the agreement, irrespective of a finding of contempt. The plaintiff implicitly concedes in his brief that, if we affirm the trial court's decision as to his first two claims, the attorney's fees award should likewise be affirmed. We therefore uphold the award of attorney's fees because we agree with the defendant that the trial court's decision as to the plaintiff's first two claims was correct.

[2] The plaintiff's opening brief to this court contains an additional claim that the trial court made a mathematical error in calculating the total past due alimony. Subsequently, in response to the defendant's motion to correct, the parties filed a joint stipulation with the trial court to amend the amount of the alimony arrearage to $249,570. The plaintiff does not challenge the stipulation or otherwise respond to the defendant's argument, made in her brief to this court, that this claim is now moot. In the absence of any argument to the contrary, we assume the stipulation effectuated the necessary correction and agree with the defendant that this claim is moot.

[3] This order went into effect as of the date of the court's decision, April 29, 2020. The trial court ordered the parties to consult with each other and to calculate the amount of alimony the plaintiff owed pursuant to the original agreement between October 1, 2019, and April 29, 2020. The plaintiff did not receive a retroactive modification.

[4] After the plaintiff appealed, the defendant moved to terminate any appellate stay. The trial court granted the defendant's motion, concluding both that the automatic appellate stay did not apply to its order of attorney's fees and that, even if it did, the court would terminate the stay pursuant to Practice Book § 61-11 (c) and *Griffin Hospital* v. *Commission on Hospitals & Health Care*, 196 Conn. 451, 493 A.2d 229 (1985). The plaintiff filed a timely motion for review pursuant to Practice Book § 66-6, requesting that this court reverse the trial court's stay decision. After oral argument before this court on the merits of the present case, we granted the motion for review but denied the requested relief. We do not have to decide whether the automatic stay exception for orders of support, prescribed by Practice Book § 61-11 (c), applies to this particular order, as fashioned by the trial court, because the trial court commendably found, in the alternative, that the *Griffin Hospital* factors weighed in favor of terminating the appellate stay. See *Griffin Hospital* v. *Commission on Hospitals & Health Care*, supra, 455–61. Even if the automatic stay did apply under these circumstances, we cannot conclude that the trial court abused its discretion in

terminating any automatic stay pursuant to *Griffin Hospital*.

[5] "Income" is consistently defined broadly in a variety of circumstances, such as tax; see 26 U.S.C. § 61 (a) (2018) (defining "gross income" for purposes of Internal Revenue Code as "all income from whatever source derived"); General Statutes § 12-213 (9) (A) (defining "gross income" consistent with 26 U.S.C. § 61 (a)); see also *Collins* v. *Commissioner of Internal Revenue*, 3 F.3d 625, 630 (2d Cir. 1993) ("[T]he term gross income has been read expansively to include all realized gains and forms of enrichment, that is, 'all gains except those specifically exempted.' . . . Under this broad definition, gross income does not include all moneys a taxpayer receives. It is quite plain, for instance, that gross income does not include money acquired from borrowings. Loans do not result in realized gains or enrichment because any increase in net worth from proceeds of a loan is offset by a corresponding obligation to repay it." (Citations omitted.)); and child support. See *Jenkins* v. *Jenkins*, 243 Conn. 584, 589 and n.4, 704 A.2d 231 (1998) (explaining that "gross income" for child support purposes is "the average weekly income before deductions" (internal quotation marks omitted)).

[6] Similarly, whether money is income or a loan is often also treated as a question of fact in other areas of the law. See, e.g., *Commissioner of Internal Revenue* v. *Indianapolis Power & Light Co.*, 493 U.S. 203, 208, 110 S. Ct. 589, 107 L. Ed. 2d 591 (1990); see also id., 208–12 ("The recipient of an advance payment, in contrast, gains both immediate use of the money (with the chance to realize earnings thereon) and the opportunity to make a profit by providing goods or services at a cost lower than the amount of the payment. . . . When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, he has received income . . . . Whether these payments constitute income when received, however, depends [on] the parties' rights and obligations at the time the payments are made. . . . When the Commissioner [of Internal Revenue] examines privately structured transactions, the true understanding of the parties, of course, may not be apparent." (Citation omitted; emphasis omitted; footnotes omitted; internal quotation marks omitted.)); *American Valmar International Ltd.*, *Inc.* v. *Commissioner of Internal Revenue*, 229 F.3d 98, 101–102 (2d Cir. 2000) ("We must uphold the Tax Court's factual findings unless they are clearly erroneous . . . . Customer deposits over which the recipient does not have 'complete dominion' are not taxable as income upon their receipt." (Citations omitted; footnote omitted.)).

[7] That the LLC did not become an S corporation until 2017 does not change our conclusion as to the money paid from Cushman & Wakefield to the LLC in 2015 and 2016 because an LLC performs the same pass-through function that S corporations do. See, e.g., *Benjamin* v. *Island Management*, *LLC*, 341 Conn. 189, 205 n.17, 267 A.3d 19 (2021) ("Our common law does not recognize LLCs, which were first created by statute in Connecticut in 1993. Public Acts 1993, No. 93-267. An LLC is a distinct type of business entity that allows its owners to take advantage of the pass-through tax treatment afforded to partnerships while also providing them with limited liability protections common to corporations." (Internal quotation marks omitted.)). Additionally, the LLC remained closely held—the plaintiff and his new wife being the only two members—and therefore maintained the same characteristics in 2015 and 2016 that made it eligible to be considered an S corporation in 2017.

[8] Limited liability companies can be organized as S corporations. "An S corporation is a small business corporation that qualifies for certain tax and financial prerogatives." *Berkley* v. *Gavin*, 253 Conn. 761, 763 n.3, 756 A.2d 248 (2000). In an S corporation, "all of its capital gains and losses, for federal income tax purposes, pass through . . . to the individual shareholders, and any federal income tax liability on capital gains is the responsibility of the individual shareholder." *Tuckman* v. *Tuckman*, supra, 308 Conn. 209. "A subchapter S corporation is a flow through entity. All of the earnings of such a company must be reported as individual income by its [shareholders]. The corporation files federal tax returns only for informational purposes." *Outdoor Development Corp.* v. *Mihalov*, 59 Conn. App. 175, 180 n.7, 756 A.2d 293 (2000).

[9] General Statutes § 46b-82 (a) provides in relevant part that the trial court "shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties and

the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability and feasibility of such parent's securing employment."

[10] Remarriage of an alimony payor is not an appropriate ground for a downward modification. See *Heard* v. *Heard*, 116 Conn. 632, 636, 166 A. 67 (1933). The plaintiff has not challenged the trial court's decision on the basis of this error, however, and, thus, we deem it waived.

[11] The trial court did not indicate why the lack of a state income tax results in a lower net income but did state more generally that, given the plaintiff's "current residence in Texas, the court has determined his net annual income and earning capacity to be approximately $250,000." The record supports the inference that the net earning capacity determination based on a Texas residence is also rooted in the plaintiff's testimony that he traveled back and forth to New York City for business. The plaintiff consulted for at least one New York based entity, Applied DNA Sciences, Inc., for which he facilitated the entry of the company's technology in the apparel market, including developing sales strategy and making introductions to stakeholders. The plaintiff testified that he would travel from Texas to New York to conduct some of that work. Although the plaintiff now complains that there was no evidence of his ability to "earn a salary in Texas at all" and no evidence that there were jobs in Texas that require his skill set, he was in the best position to present that evidence and failed to do so. See *Britto* v. *Britto*, 166 Conn. App. 240, 247, 141 A.3d 907 (2016). There was otherwise sufficient evidence to support the trial court's determination that the plaintiff's net annual earning capacity was $250,000.

[12] According to the parties' stipulation; see footnote 2 of this opinion; the amount of other consulting income, as originally found by the trial court, was understated by $23,249.