(SC 20830)

McDonald, D'Auria, Mullins, Ecker, Alexander and Dannehy, Js.*

*Syllabus*

The plaintiff appealed, on the granting of certification, from the judgment of the Appellate Court, which had affirmed the trial court's judgment dissolving his marriage to the defendant, who was a partner at a large law firm. The plaintiff claimed, inter alia, that the Appellate Court had incorrectly concluded that the defendant's interest in a potential stream of retirement payments, which was to be paid pursuant to the relevant provisions of the firm's partnership agreement, was too speculative to constitute marital property subject to equitable distribution under the statute (§ 46b-81) governing, inter alia, the assignment of property in marital dissolution cases. *Held*:

A trial court's determination of whether an asset or interest constitutes marital property for purposes of § 46b-81 presents a mixed question of law and fact subject to de novo review, the trial court's underlying factual findings are reviewed for clear error, and the question of how such determinations as to any particular asset fit into the mosaic of the trial court's financial orders is reviewed for abuse of discretion.

The Appellate Court correctly determined that the defendant's interest in the retirement payments did not constitute property subject to equitable distribution for purposes of § 46b-81.

---

* This case originally was argued before a panel of this court consisting of Chief Justice Robinson and Justices McDonald, D'Auria, Mullins, Ecker, Alexander and Dannehy. Thereafter, Chief Justice Robinson retired from this court and did not participate in the consideration of the case.

The listing of justices reflects their seniority status on this court as of the date of oral argument.

D. S. *v.* D. S.

The defendant did not have an enforceable right to receive the retirement payments insofar as the defendant's firm had a contractual right under the partnership agreement to unilaterally reduce or eliminate them at any time, even after the defendant started receiving them, and, accordingly, the defendant's receipt of the retirement payments was too speculative.

Moreover, changes in the law firm's demographics and compensation structure supported this court's conclusion that the firm's exercise of its authority to modify or terminate the retirement payments was more than a theoretical possibility, and equitable considerations weighed in favor of a conclusion that those payments should be treated as a source of potential income for alimony rather than a nonmodifiable property distribution.

The Appellate Court correctly concluded that the trial court had not abused its discretion in awarding the plaintiff alimony that was contingent on the defendant's remaining an active partner at her law firm or on her being a retired partner receiving retirement payments from the firm.

The trial court weighed all of the factors enumerated in the alimony statute (§ 46b-82 (a)), as well as the equitable factors and the circumstances relevant to the dissolution of the parties' marriage, and crafted an alimony order with the intent of ensuring that the plaintiff would be financially supported for a limited time period and of incentivizing the plaintiff to initiate a good faith job search and to acquire employment commensurate with his earning capacity.

(*One justice dissenting*)

Argued February 7, 2024—officially released January 7, 2025

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Diana, J.*, rendered judgment dissolving the marriage and granting certain other relief, from which the plaintiff appealed to the Appellate Court, *Prescott, Suarez* and *Bishop, Js.*, which affirmed the trial court's judgment, and the plaintiff, on the granting of certification, appealed to this court. *Affirmed.*

*Charles D. Ray*, with whom was *Justyn P. Stokely*, for the appellant (plaintiff).

*Kenneth J. Bartschi*, with whom were *Karen L. Dowd* and, on the brief, *Thomas P. Parrino* and *Randi R. Nelson*, for the appellee (defendant).

D. S. *v.* D. S.

*Opinion*

DANNEHY, J. In this appeal, we consider whether an interest in an unfunded retirement benefit constitutes property pursuant to General Statutes § 46b-81, when that interest will never vest because it may be unilaterally revoked by a third party at any time. The plaintiff, D. S.,[1] appeals from the judgment of the Appellate Court affirming the trial court's judgment of dissolution.[2] On appeal, the plaintiff claims that the Appellate Court incorrectly concluded that the interest of the defendant, D. S., in a potential stream of retirement payments (retirement payments) pursuant to the partnership agreement of her law firm (firm) was too speculative in nature to constitute marital property subject to equitable distribution under § 46b-81. The plaintiff further claims that the Appellate Court incorrectly concluded that the trial court did not abuse its discretion in ordering an alimony award that was tied to her employment at the firm.[3] We affirm the judgment of the Appellate Court.

[1] During the course of the trial in this case, the trial court ordered certain documents to be sealed and, at times, closed the hearings. Consistent with the Appellate Court's modification of those sealing orders pursuant to its authority under Practice Book § 77-2 (a), in this opinion, we do not refer to the parties or their children by name and do not identify any of the parties' past or present employers. See *D. S.* v. *D. S.*, 217 Conn. App. 530, 532–33 n.1, 289 A.3d 236 (2023).

[2] The plaintiff filed a petition for certification to appeal from the judgment of the Appellate Court to this court. We granted the plaintiff's petition for certification, limited to the following issues: (1) "Did the Appellate Court correctly conclude that the defendant's interest in her law firm's retirement plan was too uncertain to qualify as martial property subject to equitable distribution pursuant to General Statutes § 46b-81?" And (2) "[d]id the Appellate Court correctly conclude that the trial court had not abused its discretion in awarding alimony that . . . was terminable at the defendant's sole discretion and . . . was specific to the defendant's employment at one particular firm?" *D. S.* v. *D. S.*, 346 Conn. 924, 924, 295 A.3d 419 (2023).

[3] The defendant contends that the plaintiff's claim challenging the court's alimony award is unpreserved. We disagree. The defendant's proposed financial orders included the provision that the plaintiff now disputes, that the defendant's alimony obligation would be limited to her association with the firm, either as an active partner or a retired partner receiving retirement payments. Although the plaintiff failed to raise this particular argument in

D. S. *v.* D. S.

The record reveals the following relevant facts, either undisputed or found by the trial court. The plaintiff and defendant married in 1990, and have two children, one of whom was a minor at the time of trial.

The defendant is a partner at a large law firm, and earns an annual gross income of approximately $8 million. Until he was laid off in 2001, the plaintiff worked as an investment banker, earning more than $1 million in his most successful year. After 2002, the plaintiff made no real financial contribution to the family. Although he subsequently started his own private equity firm, this venture (and others) was unsuccessful, and that firm was dissolved several years later. During this time, in addition to managing her own growing professional responsibilities, the defendant performed legal work for the plaintiff's assorted failed business ventures, paid his employees' salaries, and handled two tax audits. At the time of the dissolution, the plaintiff had not worked for an employer for approximately eighteen years.

Despite the defendant's considerable income, the plaintiff's unchecked spending resulted in the family's accumulation of substantial debt. Although the defendant tried to institute restraints, the plaintiff rejected her efforts to demonstrate that their financial situation was dire and that his spending was unsustainable. Eventually, the defendant decided to stop providing the plaintiff with documentation of her income. The plaintiff's spending only accelerated, and the defendant was forced to borrow extensively to meet the family's financial obligations. At the time of dissolution, the defendant continued to borrow money through a line of credit to meet the family's financial obligations. Throughout this time,

the trial court in response to the court's direction, on March 5, 2021, to do so, during closing argument, the plaintiff's counsel contended that the defendant's proposed financial orders would "crush" the plaintiff and argued that the court should not adopt them. Additionally, as we discuss subsequently in this opinion, the plaintiff raised this issue in his motion to reargue.

D. S. *v.* D. S.

the plaintiff refused to seek employment, despite his impressive educational credentials and experience in the investment banking profession.

The plaintiff also terrorized the family emotionally and physically with his explosive anger, jealousy, and attempts to control the defendant's behavior. On occasions when the defendant suggested that he obtain employment, the plaintiff became "unglued and belligerent, responding usually by yelling and swearing at the defendant." He sometimes verbally abused the defendant in front of their children. On one occasion, while the defendant was showering, the plaintiff slammed the shower door so hard that the door shattered, and shards of glass injured the defendant. The trial court found that the plaintiff was solely responsible for the breakdown of the marriage due to his abusive behavior and mismanagement of the family's finances.

In 2017, the plaintiff commenced this dissolution action seeking joint custody, child support, alimony, and an equitable division of the property in the marital estate. Following a twenty day trial, the court rendered judgment dissolving the marriage. The trial court issued financial orders relating to parenting, child support, costs for the children's schooling and activities, alimony, health insurance and related costs, the disposition of the parties' assets and liabilities, and attorney's fees. Relevant to the two issues presented in this appeal, first, the court determined that the defendant's interest in the retirement payments pursuant to the partnership agreement did not constitute property for purposes of § 46b-81. Specifically, the court found that the defendant's interest in the retirement payments involves "variables, risks and requirements that are not fixed and impossible to determine at this time." In making its finding, the court relied primarily on the testimony of the defendant's expert witness, Mark Harrison, regarding the nature of the defendant's interest. The

D. S. *v.* D. S.

court concluded that the interest constituted a "mere expectancy" and had no value at the time of dissolution. Accordingly, the trial court treated these potential payments as a future stream of income to be awarded as alimony pursuant to General Statutes § 46b-82, rather than as property subject to distribution pursuant to § 46b-81. Second, the court ordered the defendant to pay the plaintiff $35,000 per month in alimony for the first twelve months after the date of dissolution, and $30,000 per month thereafter. The court ordered that this alimony obligation would terminate when the defendant was no longer employed as an active partner at the firm. Once the defendant ceased to be an active partner, as long as she was receiving retirement payments pursuant to the partnership agreement, she would be obligated to pay alimony to the plaintiff in the amount of 25 percent of her net after-tax income actually received. The court ordered that this alimony obligation would terminate upon the death of either the plaintiff or the defendant but not upon the plaintiff's remarriage.

The trial court further ordered that the defendant's alimony obligation, both prior to and after her employment as an active partner with the firm, would be "nonmodifiable upward and nonmodifiable as to increases in duration." The trial court denied the plaintiff's subsequent motion to reargue, which had challenged, among other aspects of the court's judgment, the alimony and property awards. The plaintiff appealed from the judgment of dissolution to the Appellate Court, which affirmed the judgment of the trial court. *D. S.* v. *D. S.*, 217 Conn. App. 530, 532, 552, 289 A.3d 236 (2023). This certified appeal followed. Additional facts will be set forth as necessary.

I

The plaintiff first contends that the Appellate Court and the trial court incorrectly concluded that the defen-

D. S. *v.* D. S.

dant's interest in the retirement payments was too uncertain to qualify as marital property subject to equitable distribution pursuant to § 46b-81. On the basis of the unique facts of this case, we conclude that the retirement payments did not constitute property.

The record reveals the following additional facts relevant to our resolution of this issue. As we noted previously in this opinion, in concluding that the defendant's interest in the retirement payments was a mere expectancy, the court credited and relied heavily on Harrison's expert testimony. Harrison, in turn, relied in part on a report prepared by the plaintiff's witness, Henry Guberman,[4] which describes the details of the retirement payments as set forth in the partnership agreement. In particular, Guberman's report explained the provisions in the partnership agreement governing a retired partner's eligibility to receive the retirement payments and setting forth the methodology used to calculate that partner's benefit.

In his testimony, Harrison described some general, foundational facts helpful to understanding the nature of the defendant's interest in the retirement payments. He pointed out that the payments to retired partners pursuant to the partnership agreement are not listed as a liability on the firm's financial statements. He explained that, in order to qualify as a liability for purposes of accounting, the interest must "be probable to be paid in [a] reasonably estimable . . . amount." Because the firm does not consider these payments a liability, therefore, it would be a "leap" to categorize the payments as an asset. Additionally, he testified, the payments are not funded. The firm does not maintain any capital, so

_____

[4] The plaintiff had proffered Guberman as an expert witness, but, following an extensive voir dire of Guberman by the defendant's counsel, the trial court declined to qualify him as an expert. Like Harrison, Guberman was unable to arrive at any conclusions regarding the present value of the payments that the defendant might receive upon her retirement.

D. S. *v.* D. S.

the payments are paid out from future earnings. He further testified that payments to a retired partner pursuant to the partnership agreement are not transferable and not salable.

Harrison also testified regarding numerous contingencies on which the defendant's receipt of any payments pursuant to the partnership agreement depend. Those contingencies include the termination of the payments altogether, any amendments to the partnership agreement, any violation by the defendant of the agreement's noncompete clause, and the firm's continued operation.

Most significant, Harrison testified that, pursuant to the partnership agreement, the firm, "by the mutual consent of the then [p]artners constituting at least three-fourths in number and having at least 75 [percent] of the total [p]oints," has the authority unilaterally to end the program, terminating payments to former partners at any time. In addition, Harrison testified that there are several provisions of the partnership agreement, the amendment of which would impact both the likelihood of a retired partner's receiving the payments and the quantity of any such payments. For example, amendments can and have been made to certain of the variables used to calculate a retired partner's benefit, thus changing the amount of the resulting payments. Harrison testified that these variables had been reduced over the years and that the partnership agreement authorized the firm to make further reductions, all of which present an additional risk that impacts whether the firm will make the payments.

Harrison also testified regarding changes the firm had made to its calculation of an active partner's expected benefit. Specifically, in 2020, the firm moved away from a compensation system based entirely on seniority (lockstep), replacing that system with one that, instead,

D. S. *v.* D. S.

prioritizes a partner's production level. According to Harrison, this change meant the firm recognized that not all partners are equal, and the firm needed to attract partners who could generate business in order to keep the firm profitable and "around for a long . . . time."

As to the firm's continued operation, Harrison observed that "twenty-two firms . . . almost [the] size [of the defendant's firm] have disbanded or gone bankrupt since the financial crisis in 2007." Harrison recognized that the firm had been around for a long time and was "top shelf" but noted that "there have been a lot of good firms that have had problems."

A

Our cases have not been entirely consistent as to the standard of review that governs a trial court's determination that a particular asset or interest constitutes marital property for purposes of § 46b-81, which presents a mixed question of law and fact. Several of our cases arguably have reviewed that determination under an abuse of discretion standard. See, e.g., *Dombrowski* v. *Noyes-Dombrowski*, 273 Conn. 127, 132–33, 869 A.2d 164 (2005); *Smith* v. *Smith*, 249 Conn. 265, 285–88, 752 A.2d 1023 (1999); *Eslami* v. *Eslami*, 218 Conn. 801, 808, 591 A.2d 411 (1991). For the most part, however, our recent decisions have indicated that the question ultimately is one of statutory interpretation—whether a particular asset or asset class qualifies as "property" for purposes of § 46b-81—and, therefore, is subject to our plenary review. See, e.g., *Reville* v. *Reville*, 312 Conn. 428, 446, 93 A.3d 1076 (2014); *Mickey* v. *Mickey*, 292 Conn. 597, 613, 974 A.2d 641 (2009); *Bender* v. *Bender*, 258 Conn. 733, 741, 785 A.2d 197 (2001). We take this opportunity to clarify the standard.

We have recognized that "applying the label" of "mixed question of law and fact" does not necessarily resolve the applicable standard of review. *Bortner* v.

D. S. *v.* D. S.

*Woodbridge*, 250 Conn. 241, 264, 736 A.2d 104 (1999). As the United States Supreme Court has explained, the standard of review applicable to mixed questions of law and fact depends on the nature of the mixed question, and requires us to consider "which kind of court . . . is better suited to resolve" the question. *U.S. Bank, N.A.* v. *Village at Lakeridge, LLC*, 583 U.S. 387, 395, 138 S. Ct. 960, 200 L. Ed. 2d 218 (2018). When the resolution of the mixed question of law and fact requires courts to "expound on the law, particularly by amplifying or elaborating on a broad legal standard," the standard of review is de novo. Id., 396. Our decisions addressing the question of whether a particular marital asset constitutes property for purposes of § 46b-81 invariably have expounded upon the meaning of the statutory term "property." Accordingly, the standard of review of a trial court's determination whether an asset is classified as "property" is de novo.

The trial court's underlying factual findings, however, are reviewable under a clearly erroneous standard and will be reversed only if they find no support in the record or the reviewing court is left with the definite and firm conviction that a mistake has been made. See, e.g., *FuelCell Energy, Inc.* v. *Groton*, 350 Conn. 1, 14, 323 A.3d 268 (2024); *Bornemann* v. *Bornemann*, 245 Conn. 508, 527, 531, 752 A.2d 978 (1998). Lastly, the question of how these determinations as to any particular asset fit into the mosaic of all the trial court's financial orders is reviewable for abuse of discretion.

B

We turn our attention, then, to the legal standard for determining whether a particular interest that was acquired during the marriage constitutes divisible marital property for purposes of § 46b-81. Section 46b-81 provides in relevant part: "(a) At the time of entering a decree annulling or dissolving a marriage . . . the

D. S. *v.* D. S.

Superior Court may assign to either spouse all or any part of the estate of the other spouse.

* * *

"(c) In fixing the nature and value of the property, if any, to be assigned, the court, after considering all the evidence presented by each party, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

Our legislature has not defined the term "property" in § 46b-81, leaving courts to define it. In determining the equitable distribution of resources under the statute, courts should engage in a three step process, determining (1) whether the resource is property (classification), (2) what is the appropriate method for determining the value of the property (valuation), and, (3) what is the most equitable distribution of that property between the parties (distribution). *Krafick* v. *Krafick*, 234 Conn. 783, 792–93, 663 A.2d 365 (1995). Over the past one-half century, in considering the classification of marital assets, this court and the Appellate Court have refined the definition of what does, and does not, qualify as marital property for the purposes of § 46b-81. At one end of the spectrum, it is well established that certain categories of future interests, such as vested pension benefits and contractually guaranteed stock options, qualify as marital property per se, because the holder has a presently enforceable right to receive them. See, e.g., *Bornemann* v. *Bornemann*, supra, 245 Conn. 517–20

D. S. *v.* D. S.

(stock options); *Krafick* v. *Krafick*, supra, 793–98 (vested pension benefits).[5] At the other end of the spectrum, certain types of future interests categorically do not qualify as marital property, because the possessor's present interest in them "is, at best, [a] speculative . . . [and] inchoate [hope]" that has none of the attributes of property and, instead, constitutes a mere expectancy. (Internal quotation marks omitted.) *Krause* v. *Krause*, 174 Conn. 361, 365, 387 A.2d 548 (1978). Examples of these include interests in a potential inheritance; see, e.g., id.; interests in future earnings from a professional degree; see, e.g., *Simmons* v. *Simmons*, 244 Conn. 158, 164, 708 A.2d 949 (1998); and a contingent remainder interest in a revocable inter vivos trust. See, e.g., *Rubin* v. *Rubin*, 204 Conn. 224, 227–28, 527 A.2d 1184 (1987).

This court has articulated and refined a two part test by which trial courts may determine, on a case-by-case basis, whether a potential interest constitutes divisible marital property under § 46b-81. In the first part of the *Bender* test, we ask whether the holder has "a *presently* enforceable right [to receive the interest] . . . based on contractual principles or a statutory entitlement . . . ." (Citation omitted; emphasis added.) *Mickey* v. *Mickey*, supra, 292 Conn. 628 (citing *Bender* v. *Bender*, supra, 258 Conn. 733). If the party has such a right, the interest is part of the marital estate and is distributable as property. *Mickey* v. *Mickey*, supra, 625. If the party does not have a presently enforceable right, we proceed to the second part of the *Bender* test, which involves a more fact intensive analysis. See id., 625–27.

---

[5] We have previously defined the term "vested" to refer to "pension interests 'in which an employee has an irrevocable . . . right, in the future, to receive his or her account balance (under a defined contribution plan), or his or her accrued benefit (under a defined benefit plan), regardless of whether the employment relationship continues.' [3 A. Rutkin, Family Law and Practice (1995) § 36.13 [2], p. 36-71; see id., § 37.11 [1] [b], pp. 37-157 through 37-159; see also 2 A. Rutkin et al. Valuation and Distribution of Marital Property (1991) § 23.02 [2] [a], p. 23-8] . . . ." (Citation omitted.) *Krafick* v. *Krafick*, supra, 234 Conn. 788–89 n.12.

D. S. *v.* D. S.

The second part of the *Bender* inquiry is "built [on the] foundation" established by our prior cases defining property for purposes of § 46b-81. *Bender* v. *Bender*, supra, 258 Conn. 753. In *Bender*, we explained that an interest that falls short of a presently enforceable right nevertheless qualifies as divisible marital property if a party's expectation in the interest "as a practical matter, is sufficiently concrete, reasonable, and justifiable as to constitute a presently existing property interest for equitable distribution purposes." Id., 749. This second prong of the *Bender* inquiry recognizes that the definition of "property" for purposes of equitable distribution should not be given a "narrow construction." (Internal quotation marks omitted.) Id., 753. We did not purport in *Bender*, however, to overrule our prior precedent defining property for purposes of § 46b-81. See id. The focus of the inquiry remains on obtaining an enforceable right in the interest. Our focus in the second prong, however, is on the likelihood that the holder *eventually* will acquire an enforceable right in the interest, that is, whether the interest will likely vest or whether the holder will otherwise acquire a definitive right to it. See *Mickey* v. *Mickey*, supra, 292 Conn. 628 ("[w]e conclude that *Bender* stands for the proposition that, even in the absence of a presently enforceable right to property based on contractual principles or a statutory entitlement, a party's expectant interest in property still may fall under § 46b-81 if the conditions precedent to the eventual acquisition of such a definitive right are not too speculative or unlikely").

In *Mickey*, we collected and synthesized the considerations relevant to a trial court's assessment of whether the party's interest is so speculative that it does not constitute property for purposes of § 46b-81, or, by contrast, is "sufficiently *concrete, reasonable* and *justifiable* as to constitute a presently existing property interest

D. S. *v.* D. S.

for equitable distribution purposes.'' (Emphasis in original; internal quotation marks omitted.) Id.

Under the second part of the *Bender* inquiry, a central question that courts consider is whether the party's ''right'' to the interest is one that always can be unilaterally revoked, meaning that the holder will never have a vested interest, or amended by a third party. That a will may be revised until the moment of death, or a revocable trust revoked, explains, in no small part, why those interests are too speculative to qualify as part of the marital estate.

We recognize a lack of consistency in our law regarding whether, in assessing what weight should be given to a third party's unilateral authority to revoke or modify a right to a future interest, a trial court should consider the likelihood that the third party will ever exercise that authority. In *Bender*, we considered the likelihood of exercise relevant to the inquiry. In that case, we assumed the municipality had the authority to discontinue the pension plan before the interest vested but, nevertheless, described the exercise as merely a theoretical possibility that did not prevent the unvested pension from constituting a presently existing property interest. *Bender* v. *Bender*, supra, 258 Conn. 749. We also assumed in *Mickey* that disability benefits were terminable at the state's discretion at any time before the defendant suffered an injury. *Mickey* v. *Mickey*, supra, 292 Conn. 630–31. In *Mickey*, however, we stated that ''the likelihood that the legislature would decide to modify or terminate the disability benefits . . . is irrelevant to our analysis,'' and that what mattered was simply that it had the authority to do so. (Emphasis omitted.) Id., 631 n.26. We take this opportunity to clarify that, because the second prong of the *Bender* inquiry focuses on the likelihood that a party will eventually obtain an enforceable legal right, the *likelihood* that a third party will exercise its right to unilaterally revoke

D. S. *v.* D. S.

or modify a party's right to a future interest is relevant to the analysis.

In addition to the authority of a third party to unilaterally terminate a party's right to receive the future interest, and whether the likelihood that the third party will exercise its authority is merely theoretical, courts also consider the nature of other contingencies involved, that is to say, other risks that the party will never obtain a right to the interest. The nature of these contingencies or risks sheds light on the reasonableness of the party's expectancy in the interest. A prudent person will not plan her retirement in reliance on the expected receipt of an income source that can be unilaterally denied to her, or that she is unlikely ever to receive, or the receipt of which is subject to incalculable risks. See, e.g., id., 628–29 and n.22; *Dombrowski* v. *Noyes-Dombrowski*, supra, 273 Conn. 132–33; *Bender* v. *Bender*, supra, 258 Conn. 754. This, in turn, may depend on considerations such as whether a potential income source has been funded, and whether it is transferable and negotiable. See, e.g., *Simmons* v. *Simmons*, supra, 244 Conn. 168–69.

Finally, in light of the equitable nature of dissolution proceedings, we have suggested that equitable considerations may be taken into account when assessing whether a potential interest should be considered part of the marital estate. In *Mickey*, we explained that the trial court must retain "a measure of flexibility to avoid a patently unfair result. For example . . . this approach allows a court to avoid the inequity that would occur if the marriage dissolves shortly before one of the spouse's pensions vests, especially when the pension is the primary marital asset." *Mickey* v. *Mickey*, supra, 292 Conn. 630. In addition to whether the interest represents the primary marital asset, other relevant equitable considerations include whether the benefit "represent[s] the 'fruits' of the marital partnership that § 46b-81 is

D. S. *v.* D. S.

designed to equitably parse''; id., 631; and whether it can be characterized as a form of deferred income that was earned and otherwise would have been enjoyed during the marriage. See, e.g., id., 632; *Bender* v. *Bender*, supra, 258 Conn. 752.

C

With these principles in mind, we turn our attention to the present case. It is undisputed that the defendant's interest in the retirement payments does not qualify as property under the first part of the *Bender* test, because she has no legally enforceable present right to receive it. The parties disagree, however, as to whether the defendant's interest in the retirement payments qualifies as divisible marital property under the second part of the *Bender* test. Our review of the relevant considerations persuades us that it does not.

First, not only does the defendant have no presently enforceable right to receive the retirement payments, but she never will. At any time, before and even after the defendant begins to receive retirement payments, the firm has a contractual right under the partnership agreement to unilaterally reduce or cancel those payments. The firm reserves the right to terminate the program for all retired partners, or for an individual former partner, by a three-quarters vote of the partnership. The firm's contractual authority to terminate the program or the defendant's payments thereunder at any time and "without any ascertainable standard" was central to Harrison's opinion, credited by the trial court, that the defendant's interest in her retirement payments was "the epitome of a mere expectancy." Harrison testified that he had evaluated the retirement programs of many law firms and other professional service companies but that he had "never seen anything like" the provision of the partnership agreement that allowed a small committee to recommend the suspension of a

D. S. *v.* D. S.

partner's retirement payments if it determined, for any reason, that paying it would be inequitable to the remaining partners and the firm.

As a result of the firm's contractual authority to unilaterally terminate the payments, even after the defendant begins to receive them, the defendant's interest in the stream of retirement payments will never vest, and the defendant will never have a contractual cause of action against the firm for continued payments. The plaintiff does not contend otherwise. This significant fact distinguishes the defendant's interest from the unvested pension at issue in *Bender*, where we simply assumed the municipality had the authority to discontinue the pension plan, despite recognizing that the record was silent on the defendant's rights under the collective bargaining agreement and without reference to any contractual authority providing such authority. *Bender* v. *Bender*, supra, 258 Conn. 749 and n.6

In addition, we described in *Bender* the employer's exercise of its assumed authority to discontinue the pension plan as simply "theoretically possible . . . ." Id., 749. In the present case, however, *other* risks involving, for example, changes in the firm's demographics and compensation structure, support our conclusion that its exercise of its authority to terminate or amend the retirement payments is more than a theoretical possibility. The trial court determined that, even assuming the firm continues to exist in its present form, there was a real possibility that it would, at some point, cease paying the retirement payments. That factual finding, which would be reviewable for clear error if the plaintiff had challenged it, finds support in Harrison's and the defendant's testimony, both of which the trial court credited, and business records that had been created long before the present action was initiated. Such evidence tended to show that, although the firm had never failed to make payments under the partnership agree-

D. S. *v.* D. S.

ment, demographic pressures had resulted in fundamental changes to the firm's partnership compensation structure, led to significant cuts in partners' retirement payments, and called into question the long-term viability of the program.

Over time, as a result of normal demographic trends,[6] the ratio of retired partners to active partners at the firm has risen steadily. Between 1990 and 2015, the ratio of retired to active partners had more than tripled. Equally significant, of the remaining active partners, the number who were fifty years of age or older was substantially higher in 2015 than it had been in 1990, suggesting that the demographic pressures would only continue to intensify.

The potential impact of these increasing pressures on the firm's finances was not merely a matter of speculation. At the time of trial, those pressures already had resulted in significant changes that, Harrison testified, were necessary "to keep this firm from imploding." The firm had made a series of cuts to the retirement payments, and the result of these ongoing cuts was that the retirement income received by a partner was expected to fall by as much as 50 percent between 2015 and 2040, with the average yearly payment (in constant dollars) dropping to $400,000. In addition, as of January 1, 2021, the firm discontinued its pure lockstep, or seniority, method of compensating partners and moved to a modified system that places a premium on partners' production levels.

Harrison testified that these recent developments reduced the likelihood that a retired partner would ultimately receive a retirement payment that met the part-

---

[6] See, e.g., R. Zahorsky, "Pensions Howling at the Door: WolfBlock Dissolution Underlines the Danger," 95 ABA J. (June, 2009) pp. 28, 30 (discussing unsustainability of unfunded law firm pension plans as baby boom partners retire).

D. S. *v.* D. S.

ner's expectations, or receive one at all. He specifically testified as to the interrelated nature of the risks, stating that the transition away from the lockstep method of compensation, together with fewer active partners having to support more retirees, meant that "the biggest and best producers are going to say, 'why do I want to be here, let me go to another firm that has funded their retirement [plans] . . . .'" Harrison testified that, despite the firm's long history and prestige, it might cease operating. He explained that this was not a mere theoretical possibility because, in the fourteen years between the 2007 financial crisis and the date of dissolution, twenty-two firms of nearly the same size had disbanded or gone bankrupt, more than one and one-half each year.

The defendant, who was familiar with the firm's present financial condition at the time of trial, concurred with Harrison's view that the contingencies to which her receipt of the retirement payments was subject rendered the interest a mere expectancy. According to the defendant, "[g]iven that we [had] moved to a modified lockstep compensation system, the current pension calculation doesn't really work and is going to have to be amended at some point. [The] partnership agreement . . . could be amended and . . . the payments could be eliminated." The defendant testified that "those payments are subject to a variety of conditions and uncertainty, and are not necessarily something I can count on." This testimony is consistent with the 2016 prelitigation presentation, during which the defendant warned the firm's partnership that the retirement payments could be cut by one half over the next twenty-five years and concluded with a message, one that the trial court reasonably could have interpreted as a caution to the partners that they should not rely on the retirement payments when engaging in retirement planning. At trial, the defendant characterized the presentation as

D. S. *v.* D. S.

showing "partners how they needed to save for retirement because payments postretirement were uncertain." There was credible evidence, then, that the defendant did not treat her interest in the retirement payments as property, in the sense of a reliable source of retirement income, and that, long before the present action was commenced, she had, on behalf of the firm, advised her partners against relying on it.[7] Additionally, with the exception of the plaintiff's testimony that he and the defendant had contemplated eventually moving to Wyoming on the basis of the plaintiff's belief that they would pay fewer or no taxes on the defendant's retirement income, the plaintiff offered no other testimony or evidence that the parties had ever factored in the defendant's retirement payments when planning for retirement.

Harrison opined, for example, that the defendant's retirement payments could amount to "anything from zero to a lot of money," and he stated that, if he were to attempt to place a present value on the expected payments, the amount would be so low, in light of these various risks, that he would lose his credibility before the trial court. For her part, the defendant testified that the retirement payments "can, and, in all likelihood, will be reduced over time. [T]here's no way to calculate exactly what those payments will be, *if any*." (Emphasis added.) The firm's executive director, who was responsible for the new partner financial presentations, gave substantially similar testimony, agreeing that "no one can possibly know, within a reasonable degree of certainty, the amount, *if any*, that [the defendant] may

_____

[7] The plaintiff and the dissent construe the defendant's 2016 presentation to mean that the firm had taken the steps necessary to shore up its finances. But the trial court, as the finder of fact, reasonably could have embraced the interpretation, advanced by both Harrison and the defendant, that the *best case* scenario was a significant, ongoing cut in payments and that the worst case scenario was a total termination of the program.

D. S. *v.* D. S.

receive . . . upon her departure from the firm.''
(Emphasis added.)

Consistent with the testimony of both Harrison and
the defendant, the trial court found that the retirement
payments were "unique in form and substance . . . ."
The fact that the firm has struggled with intensifying
demographic pressures and had, shortly before trial
in the present case, transitioned to a new partnership
compensation structure, in tandem with the fact that
the partnership agreement contains the unique escape
valve allowing the firm to terminate payments under
the retirement payments at any time, provides more
than adequate support for the trial court's determina-
tion that "[the] stream of payments involves variables,
risks and requirements that are not fixed and [are]
impossible to determine," and, therefore, that it was
too speculative to qualify as a presently existing prop-
erty interest.

The plaintiff claims that the fact that it is impossible
to predict the size of the retirement payments that the
defendant will receive, and, thus, to calculate the pres-
ent value of the defendant's interest in those payments
with any certainty, did not preclude the trial court from
classifying it as property because there are other meth-
ods of distributing marital assets. See, e.g., *Bender* v.
*Bender*, supra, 258 Conn. 750 n.7 (noting that, regardless
of length of employee's service, unvested pension con-
stituted marital property, and observing that "the trial
court could choose simply not to distribute it because
its value—not its classification—was too insignificant
*or conjectural* in the marital scheme of things" (empha-
sis added)). According to the plaintiff, if we conclude
that the defendant's interest in the retirement payments
is not so speculative as to be a mere expectancy, the
trial court could have treated the interest as property
and assigned each party some fixed percentage of what-
ever payments she ultimately receives. But Harrison

D. S. *v.* D. S.

did not merely testify that this range of contingencies made it impossible to place a present value on the defendant's potential retirement payments. Rather, he concluded that the range and scope of contingencies rendered the defendant's receipt of the retirement payments too speculative to qualify as property.[8]

The plaintiff points to a 2016 email exchange in which the defendant estimated that, at that time, her retirement payments might have a present value of $14 million. The trial court reasonably could have declined to afford any weight to that evidence, in light of (1) the agreement of both parties' experts that the retirement payments were impossible to value with any degree of confidence, (2) the plaintiff's testimony that her 2016 email likely reflected "a back of the envelope calculation that one of [her] partners had done," and (3) the fact that the email exchange itself indicated that it was predicated on optimistic assumptions as to discount rates and that, "with the cutback, the pension isn't worth much."

Finally, we examine relevant equitable considerations, such as whether the interest in question is the divorcing couple's primary asset or source of retirement security. That certainly was not the case here. Aside from the retirement payments, the defendant owned three conventional retirement plans through the firm: a Keogh plan valued at almost $1.8 million, a 401k plan valued

___

[8] We observe that, even if the trial court had determined that the defendant's interest in the retirement payments was property, the court would have been well within its discretion to do exactly what it did and, instead, award the plaintiff a 25 percent share as alimony. See General Statutes § 46b-82 (court may order alimony "in addition to *or in lieu of*" award of property (emphasis added)); see also, e.g., *Mickey* v. *Mickey*, supra, 292 Conn. 630 and n.24 (court has discretion to consider equities of situation and to fashion alimony award that accounts for marital asset). Because there is no indication in the record that the trial court contemplated this alternative approach, any determination by this court regarding the propriety of any such action by the trial court would require speculation.

D. S. *v.* D. S.

at over $1.5 million, and a defined benefit pension plan with an annual benefit of approximately $197,000. The trial court awarded 35 percent of the value of each of those plans—well over $1 million—to the plaintiff. And, notably, the judgment did not deny the plaintiff a share of the defendant's retirement payments; he simply would receive his share of any payments in the form of alimony, rather than as a property distribution.

Other equitable considerations also weigh in favor of the trial court's conclusion that the retirement payments should be treated as a source of potential income for alimony, rather than a nonmodifiable property distribution. The court found that the plaintiff was entirely responsible for the breakdown of the marriage, both financially and relationally. The court found that "the plaintiff did not contribute to the acquisition, preservation or appreciation of the parties' assets [but, rather, that] he was the primary reason the assets were recklessly depleted and wasted." The court faulted the plaintiff's "rage," "verbal intimidation," "constant arguing and abusive behavior," and "obsessive, jealous, threatening" conduct for the breakdown of the marriage, concluding that the plaintiff had "terrorized the family emotionally and physically with his rage, explosive anger, control and jealousy." The court also found that the plaintiff had an earning capacity of "$150,000 after about six months of [short-term or] gig assignments and selective placement by a professional placement service." Nevertheless, the court granted the plaintiff generous property and alimony awards and required the defendant to assume the majority of the couple's debts. The plaintiff will not be left destitute, and he did not suffer any injustice, as a result of the trial court's property distribution and alimony awards.

In conclusion, there was adequate support in the record for the trial court's factual findings. On this factual record, and in light of the trial court's credibility

D. S. *v.* D. S.

determinations, we conclude that the trial court correctly determined that the defendant's receipt of the retirement payments was too speculative to constitute property for purposes of § 46b-81.[9]

We have two primary disagreements with the dissenting opinion. First, although, if we had been the triers of fact, our own findings might be guided by the same sorts of commonsense intuitions that animate much of the dissent, as an appellate tribunal, we must accept, unless clearly erroneous, the factual findings and credibility determinations made by the trial court. Those findings firmly ground the trial court's determination that the defendant's interest in the retirement payments is too speculative to qualify as present marital property. Second, with respect to the governing legal principles as applied to the facts found by the trial court, we have a fundamental disagreement as to what constitutes property under § 46b-81, as construed by this court in *Bender* and its progeny.

As we discussed, although the property question ultimately is a legal one, to the extent that it hinges on underlying factual findings, credibility determinations, and assessments of the probability of various outcomes, we defer to the trial court unless its findings and determinations are clearly erroneous. The dissent relies throughout its opinion on its own assumptions and determinations regarding the defendant and her law firm, untethered from the trial court's memorandum of decision, everything from the firm being "among the

_____

[9] The plaintiff contends that the conclusion that the defendant's interest in the retirement payments does not qualify as divisible marital property is in tension with the determination reached by several other courts that substantially similar retirement plans are marital property. See, e.g., *Hussey* v. *Hussey*, Docket No. FST-FA-01-0183296-S, 2003 WL 21494762, *4 (Conn. Super. June 11, 2003); *Douglas* v. *Douglas*, 281 App. Div. 2d 709, 712–13, 722 N.Y.S.2d 87 (2001); *Wright* v. *Wright*, 61 Va. App. 432, 451–53, 737 S.E.2d 519 (2013). None of those decisions is binding on this court, however, and each is readily distinguishable.

351 Conn. 1 JANUARY, 2025 25

D. S. *v.* D. S.

most profitable . . . in the world'' to ''shock'' at anyone questioning its financial future.

At the same time, despite the lack of any claim in this appeal that the trial court's factual findings and credibility determinations were clearly erroneous, the dissent affords no deference to the findings that the trial court did make, such as the court's determination that the defendant's expert witness was credible and its reliance on that expert's testimony in concluding that the defendant's interest amounted to a mere expectancy. Harrison provided detailed testimony regarding the unique nature of the partnership agreement and the retirement payments. He also testified without objection that, on the basis of his analysis, the retirement payments were a mere expectancy. After stating that it credited Harrison's testimony, the trial court found: ''This stream of payments involves variables, risks and requirements that are not fixed and impossible to determine at this time. This future income is not carried as a liability by the law firm on [its] books, not guaranteed, not transferable, not salable, not funded and can be entirely eliminated at any time. Thus, its value today is found to be a mere expectancy.'' The dissent's analysis rejects the trial court's determination to credit Harrison's testimony, despite the lack of any challenge to that determination in this appeal.[10]

---

[10] The dissent contends that Harrison's testimony that the defendant's interest in the retirement payments is ''the epitome of a mere expectancy'' went to the ''ultimate legal issue'' in the case and is entitled to no weight. As we noted, the plaintiff's counsel did not object to this testimony, and the plaintiff does not in this appeal challenge its admission into evidence. Therefore, whether the court abused its discretion in admitting this single statement is not before this court. We note, however, that the finder of fact is an experienced trial judge, and, notwithstanding the dissent's assertions to the contrary, it is clear from the record and the memorandum of decision that the trial court made an independent determination of whether the retirement payments were property under the statute and did not merely rely on Harrison's statement that the interest was a mere expectancy. The trial court also credited the testimony of the defendant, who was familiar with the firm's financial condition at the time of trial and who echoed Harrison's analysis that it was possible that the firm would have to terminate the retirement payments altogether.

D. S. *v.* D. S.

In addition to being grounded on an improper rejection of the factual findings and credibility determinations of the trial court, the dissent's analysis is predicated on an incorrect premise: that, pursuant to *Bender*, retirement benefits of all types qualify as marital property per se. Neither *Bender* nor any of the subsequent cases applying its expanded understanding of marital property support the dissent's reading of that case. When this court considered in *Bender* whether unvested government pension benefits qualified as property subject to equitable distribution pursuant to § 46b-81, it could have adopted a per se rule that retirement benefits qualify as marital property. It did not. Instead, as we explained previously in this opinion, the second part of the *Bender* inquiry requires trial courts to engage in a probabilistic assessment of the claimed property interest to determine whether the interest is too speculative to constitute property subject to equitable division.[11] That is, pursuant to *Bender* and its progeny, in determining whether a retirement benefit constitutes property under § 46b-81, trial courts must assess the

---

[11] As the present case illustrates—and as this court may not have contemplated when crafting its rule in *Bender*—retirement benefits come in myriad forms, some of which defy a probabilistic assessment. One treatise has observed that, "[i]n recent years . . . there is now a broad general consensus that retirement plans *of all types* . . . constitute property" for purposes of equitable distribution. (Emphasis altered.) 2 B. Turner, Equitable Distribution of Property (3d Ed. 2005) § 6:22, p. 135; see, e.g., Ala. Code § 30-2-51 (b) (1) (Supp. 2023) ("The marital estate is subject to equitable division and distribution. Unless the parties agree otherwise, and except as otherwise provided by federal or state law, the marital estate includes any interest, whether vested or unvested, either spouse has acquired, received, accumulated, or earned during the marriage in any and all individual, joint, or group retirement benefits including, but not limited to, any retirement plans, retirement accounts, pensions . . . ."); Fla. Stat. Ann. § 61.075 (6) (West 2019) ("[a]s used in this section . . . (a) 1. '[m]arital assets and liabilities' include . . . e. [a]ll vested and nonvested benefits, rights, and funds accrued during the marriage in retirement, pension, profit-sharing, annuity, deferred compensation, and insurance plans and programs"). Neither of the parties, however, has asked this court to revisit *Bender* or to adopt a per se rule that retirement benefits of all types accrued during the marriage constitute property, a step that would be necessary in order to adopt the dissent's position.

D. S. *v.* D. S.

likelihood that the owning spouse will ever acquire a legally enforceable right to that retirement benefit. See *Mickey* v. *Mickey*, supra, 292 Conn. 628 ("*Bender* stands for the proposition that, even in the absence of a presently enforceable right to property based on contractual principles or a statutory entitlement, a party's expectant interest in property still may fall under § 46b-81 if the conditions precedent to the eventual acquisition of such a definitive right are not too speculative or unlikely"); id., 623 n.19 (question turns on whether third party can unilaterally revoke interest); see also id., 641 n.8 (*Norcott, J.*, concurring and dissenting) ("[U]nder the second prong of *Bender* . . . our inquiry properly would focus on the likelihood that an enforceable right to such benefits would be obtained . . . and not on whether the benefits were likely actually to be received. See *Bender* v. *Bender*, supra, 258 Conn. 749–50 (analyzing likelihood that defendant would obtain enforceable right to unvested pension benefits, and not likelihood that such benefits subsequently would be received)." (Emphasis omitted.)).

Nor do two other cases cited by the dissent, *Reville* v. *Reville*, supra, 312 Conn. 428, and *Tilsen* v. *Benson*, 347 Conn. 758, 299 A.3d 1096 (2023), demand a different result. In *Reville*, in one brief aside, this court suggested that, under *Bender*, the trial court would have been required to treat an unvested pension as distributable property. See *Reville* v. *Reville*, supra, 458. That comment, however, was dictum, in light of our repeated statements in that decision that resolving the property question was not necessary to the resolution of the case. Id., 458–59. The comment also was made without the benefit of any discussion of the relevant considerations summarized in *Mickey* and, indeed, without any analysis of the specific details of the plan. To the extent that our statement in *Reville* was predicated on a view that any unvested retirement plan or income source categorically qualifies as marital

D. S. *v.* D. S.

property, we again clarify that, under *Bender* and *Mickey*, whether an unvested plan qualifies as marital property requires a fact-specific analysis according to the considerations discussed in those cases. See, e.g., *Czarzasty* v. *Czarzasty*, 101 Conn. App. 583, 594, 922 A.2d 272 (requiring case-by-case analysis under § 46b-81), cert. denied, 284 Conn. 902, 931 A.2d 262 (2007).

The dissent also cites *Tilsen* for the proposition that distributions from a limited partnership were marital property, even though the plaintiff in that case never would obtain an enforceable right to receive those distributions under the partnership agreement. That characterization glosses over the fact that this court never determined that the interest at issue in *Tilsen* was property. Rather, we relied on the parties' stipulation that it be treated as such. See *Tilsen* v. *Benson*, supra, 347 Conn. 806. Moreover, to the extent that the trial court in that case made any independent findings concerning the property question, those findings, contained in a footnote, were dicta to the effect that the parties previously had relied on the distributions as part of their budget and as a source of retirement savings. See id., 804, 806 n.26. In that regard, *Tilsen* simply exemplifies the equitable exception that both *Bender* and *Mickey* left open, and is readily distinguished from the present case, in which the defendant's testimony, credited by the trial court, established that she did not view the retirement payments as something she could "count on."

II

The plaintiff next claims that the trial court abused its discretion by awarding alimony that was specific to the defendant's employment at one particular firm.[12] On the

[12] The plaintiff also claims that the trial court improperly delegated its authority by ordering that the defendant's alimony obligation would automatically terminate when she was no longer employed as an active partner at the firm. Specifically, the plaintiff claims that the alimony order unlawfully permits the defendant to stop paying alimony, without seeking approval from the court, simply by changing her employment. The trial court's order

D. S. *v.* D. S.

basis of the facts of this case, and applying the required deferential standard of review, we disagree.

"An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did . . . . In determining whether a trial court has abused its discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Birkhold* v. *Birkhold*, 343 Conn. 786, 808–809, 276 A.3d 414 (2022). "In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall consider the evidence presented by each party and shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability and feasibility of such

in the present case stands in sharp contrast to the one at issue in this court's recent decision in *R. H.* v. *M. H.*, 350 Conn. 432, 433, 324 A.3d 720 (2024), in which we reversed in part the judgment of the trial court on the basis that the court improperly delegated its authority when it gave a parent the authority to "decide the nature and scope of the visitation of his ex-spouse . . . ."

In the present case, the court's order did not give the defendant the authority to make a binding decision as to the terms of her alimony obligation to the plaintiff. The trial court, not the defendant, determined the appropriate amount of alimony and then articulated the circumstances under which it would terminate. The court concluded that the plaintiff should receive alimony as long as the defendant is employed as an active partner at her firm or is receiving retirement payments pursuant to the firm's partnership agreement. Although the defendant has some measure of control over when these requirements would no longer be satisfied, the determination of the conditions themselves was not left to her discretion. Accordingly, we conclude that the court did not delegate its authority to the defendant. We find the plaintiff's arguments to the contrary unpersuasive.

D. S. *v.* D. S.

parent's securing employment.'' General Statutes § 46b-82 (a). Although our review is limited to whether the court correctly applied the law and reasonably concluded as it did, it is "well established that, in awarding alimony, the trial court must take into account all the statutory factors enumerated in . . . § 46b-82 (a) and that its failure to do so constitutes an abuse of discretion." (Footnote omitted.) *Oudheusden* v. *Oudheusden*, 338 Conn. 761, 768–69, 259 A.3d 598 (2021). "The trial court does not need to give each factor equal weight or make express findings as to each factor, but it must consider each factor. . . . In addition, it is a long settled principle that the defendant's ability to pay is a material consideration in formulating financial awards. . . . Finally, the trial court's financial orders must be consistent with the purpose of alimony: to provide continuing support for the nonpaying spouse, who is entitled to maintain the standard of living enjoyed during the marriage as closely as possible. . . . When exercising its broad, equitable, remedial powers in domestic relations cases, a court must examine both the public policy implicated and the basic elements of fairness." (Citations omitted; internal quotation marks omitted.) Id., 769.

Under the trial court's alimony order, the duration and amount of alimony are contingent on the defendant's being either an active partner in the firm or a retired partner receiving retirement payments. That is, the initial alimony award (after the first twelve months postdissolution) in the amount of $30,000 per month will cease when the defendant is no longer an active partner in the firm. After the defendant ceases to be an active partner, to the extent that she receives the retirement payments pursuant to the partnership agreement, she is obligated to pay the plaintiff alimony in the amount of 25 percent of her net after-tax income. The plaintiff claims that this order improperly conditions the defendant's alimony obligation

D. S. *v.* D. S.

on her association with the firm, either as an active or retired partner receiving the retirement payments.

The alimony order in the present case reflects the trial court's intention to ensure that the plaintiff would be financially supported for a limited time period, specifically, while the defendant remained an active partner at the firm and, thereafter, if and during the time that the defendant received the retirement payments from the firm. The trial court explained that the purpose of the duration and amount of its alimony order was to "provide the plaintiff with the financial incentive to initiate a good faith job search and acquire employment commensurate with his earning capacity so that he may contribute toward his own expenses."

The record reveals that the trial court weighed the appropriate statutory and equitable factors in crafting its alimony order. The trial court described the parties' financial circumstances as "dire" and found that, beginning in 2016, the plaintiff's spending habits "accelerated considerably and were out of control." The plaintiff had voluntarily been out of work for eighteen years and had not sought employment since 2008. The plaintiff explained his refusal to seek employment by contending that he was responsible for caring for the parties' children while the defendant worked. Although such an arrangement would not be unreasonable, the court explicitly rejected the plaintiff's contention that he was too busy in this role to secure a job. At the time of the trial in 2021, the defendant had, since 2018, been paying the plaintiff pendente lite monthly alimony of $37,500 per month. On the basis of the expert testimony of a psychologist, the court determined, however, that the plaintiff had an earning capacity of $150,000 after about six months of "gig assignments . . . ." Although the court acknowledged that, given the plaintiff's age and medical concerns, a "focused genuine effort" on his part would be necessary to find productive employment, it

D. S. *v.* D. S.

nevertheless found that he would be able to do so, provided he did make such an effort.

The trial court also concluded that the plaintiff was "solely responsible and at fault" for the breakdown of the marriage and that the "emotional cost" he inflicted on the defendant and the family could not be measured. The court found that "[t]he plaintiff's behavior destroyed the love, respect and foundation of this marriage." The court noted that the plaintiff had "terrorized the family emotionally and physically with his rage, explosive anger, control and jealousy," and characterized him as "a bully who verbally, physically and financially abused the defendant and exposed their children to his deportment." The trial court found that, during the marriage, the defendant "paid and paid and paid as the plaintiff [had] become her biggest creditor." The trial court described the plaintiff as the primary reason the marital assets were recklessly depleted and wasted. The trial court's memorandum of decision describes a "rampage" that included, despite the defendant's efforts to curb the plaintiff's spending, "tens of thousands of dollars in credit card charges each month at restaurants, traveling, buying expensive designer clothing and gifts, and leasing expensive foreign cars (and horses) . . . ." The trial court noted that the defendant struggled to keep up with the bills and had no alternative but to regularly secure "enormous loans to meet the [plaintiff's] extravagant spending behavior" and that, as a result, the defendant was "left dealing with carrying debt that [was] overwhelming . . . ."

We have previously observed that, although alimony "is not to be considered either as a reward for virtue or as a punishment for wrongdoing, a spouse whose conduct has contributed substantially to the breakdown of the marriage should not expect to receive financial kudos for his or her misconduct." *Robinson* v. *Robinson*, 187 Conn. 70, 72, 444 A.2d 234 (1982). There is

D. S. *v.* D. S.

no indication that the court fashioned the defendant's alimony with an intent to punish the plaintiff for his behavior. But, in light of the foregoing factors—including the plaintiff's "considerable" potential to earn his own income on the basis of his "personal effort" and his sole responsibility for the breakdown of the marriage—the limitations imposed by the court were an appropriate exercise of its discretion.

The plaintiff, however, challenges the duration of the alimony order, insofar as it is contingent on the defendant's affiliation with the firm. According to the plaintiff, the trial court abused its discretion in tying the alimony award to the defendant's being an active partner at the firm, because she could leave the firm at any time.

It is well established that a trial court may award time limited alimony for the purpose of allowing a spouse to become self-sufficient. See, e.g., *Dan* v. *Dan*, 315 Conn. 1, 11, 105 A.3d 118 (2014) ("[u]nderlying the concept of time limited alimony is the sound policy that such awards may provide an incentive for the spouse receiving support to use diligence in procuring training or skills necessary to attain self-sufficiency" (internal quotation marks omitted)); *Bornemann* v. *Bornemann*, supra, 245 Conn. 539 ("rehabilitative alimony, or time limited alimony, is alimony that is awarded primarily for the purpose of allowing the spouse who receives it to obtain further education, training, or other skills necessary to attain self-sufficiency").

The fact that the plaintiff has suggested hypothetical scenarios in which he could be disadvantaged by the conditions of the alimony order does not render the order unreasonable. Although the plaintiff introduced evidence that, in 2016, he and the defendant had discussed some of the potential financial implications that could result if she were to leave her firm, she never did so. Rather, the defendant testified that she did not

D. S. *v.* D. S.

know when she would retire. She also stated, however, that she was "unlikely to be able to work . . . past sixty-two" because "[t]he average retirement age at [the firm] is sixty." The defendant never testified that she planned to leave the firm before her retirement. The defendant described that her amended proposed order with respect to alimony was intended to give her some "breathing room" to pay down debts while she was still an active partner in the firm, because she would be unlikely to work at the firm past the age of sixty-two. The defendant also testified that the age of sixty-two was significant because, at that time, she would no longer be receiving income from the firm. Although she would then be entitled to retirement payments under the partnership agreement, the defendant noted that "those payments are subject to a variety of conditions and uncertainty, and are not necessarily something I can count on." The trial court found that the defendant's testimony was "credible and reliable." Accordingly, it fashioned an order based on the premise that the defendant would continue to be employed as an active partner at her firm for approximately five more years before retiring, during which time the plaintiff would be entitled to monthly payments of $30,000 in alimony. Furthermore, the court ordered that the plaintiff would be entitled, limited by either his or the defendant's death, to a percentage of any retirement payments the defendant might receive, providing him with additional, potentially long-term, support. The trial court did not abuse its discretion by limiting the duration of the plaintiff's first alimony award to the duration of the defendant's employment as an active partner at the firm and the plaintiff's second alimony award to the defendant's potential receipt of the retirement payments. Provided the plaintiff obtained a job and adjusted his lifestyle, the court anticipated that such an arrangement would allow him to "live comfortably." Contrary to the plaintiff's asser-

D. S. *v.* D. S.

tions, he has not demonstrated that this order was irrational or inconsistent with the purpose of the alimony statute.

In reviewing an alimony order, we do not substitute our judgment for that of the trial court, which is in the best position to fashion an effective and equitable arrangement. An award of alimony is permissive, not mandatory, and "rest[s] in the sound discretion of the trial court . . . ." *Debowsky* v. *Debowsky*, 12 Conn. App. 525, 526, 532 A.2d 591 (1987). Here, it is apparent that the trial court considered the various circumstances attending the dissolution of the parties' marriage and issued an order that would provide the plaintiff with appropriate financial support. We do not suggest that conditioning alimony on a party's relationship with a particular employer is appropriate in every instance, and this case should not be read to so hold. Under the unique facts of this case, however, it was reasonable for the court to expect that the defendant's departure from her firm would coincide with her retirement from full-time employment. We therefore conclude that the Appellate Court correctly held that there was no abuse of discretion.

The judgment of the Appellate Court is affirmed.

In this opinion McDONALD, D'AURIA, MULLINS and ALEXANDER, Js., concurred.

ECKER, J., dissenting. In *Bender* v. *Bender*, 258 Conn. 733, 749, 753–54, 785 A.2d 197 (2001), and its progeny, we eschewed a formalistic legal definition of the term "property" in General Statutes § 46b-81,[1] concluding

[1] General Statutes § 46b-81 provides in relevant part: "(a) At the time of entering a decree annulling or dissolving a marriage . . . the Superior Court may assign to either spouse all or any part of the estate of the other spouse. . . .

\* \* \*

"(c) In fixing the nature and value of the property, if any, to be assigned, the court, after considering all the evidence presented by each party, shall

D. S. *v.* D. S.

that, in divorce proceedings, the legislature intended "a spectrum of interests that do not fit comfortably into our traditional [property] scheme . . . [to] be available in equity for courts to distribute." *Mickey* v. *Mickey*, 292 Conn. 597, 625, 974 A.2d 641 (2009). Our jurisprudence establishes that retirement benefits—whether vested or unvested, funded or unfunded, contributory or noncontributory—generally constitute property subject to equitable distribution because, "as a practical matter," the parties' expectation of receiving these benefits "is sufficiently concrete, reasonable and justifiable as to constitute a presently existing property interest for equitable distribution purposes." *Bender* v. *Bender*, supra, 749; see also *Reville* v. *Reville*, 312 Conn. 428, 445–46, 93 A.3d 1076 (2014) (unvested, unfunded, noncontributory pension plan subject to discontinuation or alteration was not excluded from definition of property); *Bender* v. *Bender*, supra, 749 (unvested pension benefits constituted property); *Krafick* v. *Krafick*, 234 Conn. 783, 795, 663 A.2d 365 (1995) (vested pension benefits constitute property "[w]hether the plan is contributory or noncontributory" (internal quotation marks omitted)). Until today, we have never excluded an expected stream of future retirement benefits acquired during the life of a marriage from the definition of property subject to equitable distribution pursuant to § 46b-81.

Our prior precedent holds that retirement benefits generally constitute marital property due to the unique nature of these benefits and the important economic role that they serve. More particularly, we have categorized retirement benefits as property because "employers and

consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

D. S. *v.* D. S.

employees treat [them] as property in the workplace''; *Bender* v. *Bender*, supra, 258 Conn. 750; they ''represent a form of deferred compensation for services rendered'' during the marriage; (internal quotation marks omitted) id.; they ''are significant marital assets''; id., 752; and ''they represent the fruits of the marital partnership in practical and emotional ways . . . .'' Id., 754. Our jurisprudence is consistent with the ''broad general consensus [among our sister states] that retirement plans of all types do constitute property'' subject to equitable distribution at the time of divorce. (Emphasis omitted.) 2 B. Turner, Equitable Distribution of Property (3d Ed. 2005) § 6:22, p. 135.

Despite this foundational understanding about the nature and function of retirement benefits, the majority concludes that the retirement benefits at issue in this case do not constitute marital property within the meaning of § 46b-81 because, among other things, they ''will never vest'' and ''may be unilaterally revoked by a third party at any time.'' According to the majority, the touchstone of the property inquiry is whether ''the holder *eventually* will acquire an enforceable right in the interest, that is, whether the interest will likely vest or whether the holder will otherwise acquire a definitive right to it.'' (Emphasis in original). Part I B of the majority opinion. In my view, the majority's conclusion that an irrevocable, vested, and enforceable legal right is the sine qua non of marital property under § 46b-81 is inconsistent with the fundamental principles underlying *Bender* and its progeny. See *Bender* v. *Bender*, supra, 258 Conn. 753 (rejecting notion that ''enforceable contract rights'' are ''the sine qua non of 'property' under § 46b-81''). In the present case, the evidentiary record discloses that the retirement benefits at issue were unquestionably the fruits of the marital partnership and that the parties' expectation of receiving those benefits as a practical matter was the very opposite of speculative, and certainly was ''sufficiently concrete, reasonable

D. S. *v.* D. S.

and justifiable as to constitute a presently existing property interest for equitable distribution purposes." Id., 749. I therefore dissent.[2]

The categorization of an interest as marital property under § 46b-81 proceeds in three stages, asking, "first, whether the resource is property within § 46b-81 to be equitably distributed (classification); second, what is the appropriate method for determining the value of the property (valuation); and third, what is the most equitable distribution of the property between the parties (distribution)." (Internal quotation marks omitted.) Id., 740. The present appeal is focused exclusively on the first stage of the analysis, classification, and we must determine whether the retirement payments at issue correctly were classified as falling outside the statutory definition of "property" in § 46b-81. As the majority correctly points out, this is a mixed question of law and fact. See part I A of the majority opinion. We review the facts found by the trial court for clear error, but the ultimate issue of classification is a legal one subject to de novo review. See id.; see also *Reville* v. *Reville*, supra, 312 Conn. 446; *Mickey* v. *Mickey*, supra, 292 Conn. 613. See generally *Crews* v. *Crews*, 295 Conn. 153, 164, 989 A.2d 1060 (2010) ("[w]hen the trial court conducts a legal analysis or considers a mixed question of law and fact, plenary review is appropriate, even in the family law context").

---

[2] Because the trial court's legal error in categorizing the retirement payments as nonproperty necessarily affects its award of those payments as alimony, I need not address the claim on appeal challenging the trial court's alimony award. See part II of the majority opinion; see also *Tuckman* v. *Tuckman*, 308 Conn. 194, 214, 61 A.3d 449 (2013) ("We previously have characterized the financial orders in dissolution proceedings as resembling a mosaic, in which all the various financial components are carefully interwoven with one another. . . . Accordingly, when an appellate court reverses a trial court judgment based on an improper alimony, property distribution, or child support award, the appellate court's remand typically authorizes the trial court to reconsider all of the financial orders." (Internal quotation marks omitted.)).

D. S. *v.* D. S.

"The term 'property' is not defined in § 46b-81 or elsewhere in the [relevant statutory scheme]." *Krafick* v. *Krafick*, supra, 234 Conn. 794. We have held that this term must be construed broadly to effectuate the legislative purpose of the equitable distribution statutes, which "is to recognize that marriage is, among other things, a shared enterprise or joint undertaking in the nature of a partnership to which both spouses contribute—directly and indirectly, financially and nonfinancially—*the fruits of which* are distributable at divorce." (Emphasis in original; internal quotation marks omitted.) Id., 795; see also *Bornemann* v. *Bornemann*, 245 Conn. 508, 515–16, 752 A.2d 978 (1998) ("in enacting § 46b-81, the legislature acted to expand the range of resources subject to the trial court's power of division, and did not intend that property should be given a narrow construction").

*Bender* and its progeny reject the formalistic legal criteria traditionally used to determine the existence of a property interest. The "legislative purpose [animating § 46b-81] counsels against interpreting the term 'property' so as to be strictly limited to the confines of traditional property law, defined solely by enforceable contract rights, to the exclusion of other interests that . . . are appropriately recognized as property within the marital context." *Bender* v. *Bender*, supra, 258 Conn. 753. As *Bender* makes clear, a "presently enforceable" right to an asset under traditional property or contract principles is "*not* the sine qua non of property under § 46b-81." (Emphasis added; internal quotation marks omitted.) *Mickey* v. *Mickey*, supra, 292 Conn. 625. Although a legally enforceable right may be "*sufficient* for purposes of § 46b-81, [it] is not *necessary*." (Emphasis in original.) Id., 629. The definition of property is expansive and includes "a spectrum of interests that do not fit comfortably into our traditional [property] scheme and yet [are] available in equity for courts to distribute." Id., 625. An "unconventional" or "inchoate"

D. S. *v.* D. S.

interest contingent on the happening or nonhappening of future events may constitute distributable property under § 46b-81 if the contingency is not "overly speculative." (Internal quotation marks omitted.) Id.; see, e.g., *Tilsen* v. *Benson*, 347 Conn. 758, 804, 806 n.26, 299 A.3d 1096 (2023) (under *Bender* and its progeny, net distributions historically made by limited partnership to plaintiff were property for purposes of § 46b-81, even though plaintiff had no enforceable right to receive distributions under partnership agreement). An inchoate interest is not overly speculative if, "as a practical matter," a party's expectation of receiving the property "is sufficiently concrete, reasonable and justifiable as to constitute a presently existing property interest for equitable distribution purposes." *Bender* v. *Bender*, supra, 749.

Utilizing this analytical framework, we concluded in *Bender* that "unvested pension benefits are not too speculative to be considered property subject to equitable distribution under § 46b-81." Id. Such benefits properly are categorized as marital property because "employers and employees treat retirement benefits as property in the workplace," and because they "represent a form of deferred compensation for services rendered . . . ." (Citation omitted; internal quotation marks omitted.) Id., 750. "Most retirement plans permit the employee to take a reduction in present salary in exchange for increased future retirement benefits, and employees frequently make use of these provisions. Likewise, employers frequently use lucrative retirement packages in lieu of additional salary to attract and retain desirable employees. If retirement benefits were truly only [a mere expectancy], employers and employees would not treat them as a substitute for present wages." (Internal quotation marks omitted.) Id., 750–51. Retirement benefits, regardless of funding source and vesting status, "represent a trade-off for potentially higher wages not

D. S. *v.* D. S.

earned during the marriage; they often represent . . . the only or principal material asset; and . . . they represent the fruits of the marital partnership in practical and emotional ways . . . ." Id., 754. For this reason, "any uncertainty regarding vesting is more appropriately handled in the valuation and distribution stages, rather than in the classification stage." Id., 749–50.

In arriving at our holding in *Bender*, we noted that "our conclusion is also consistent with the majority of other appellate courts that have addressed this issue." Id., 751 n.8; see id. (citing cases). Indeed, my research reveals that, "[e]xcept for Indiana[3] and Arkansas,[4] all American jurisdictions now treat both vested and unvested pensions as property." (Emphasis omitted; footnotes altered.) 2 B. Turner, supra, § 6:22, pp. 137–39. The overwhelming majority of states recognize that retirement benefits acquired during marriage constitute marital property, regardless of funding structure or vesting status, because "employees frequently decide to [forgo] present salary in exchange for future retirement benefits. Salary earned during the marriage, of course, is marital property. If pensions do not constitute property, then spouses who own [retirement benefits] would have a powerful incentive to exchange marital property salary for separate property [retirement benefit] rights. The result would work substantial prejudice on [non-owning] spouses, as the courts would essentially be forced to tolerate dissipation of the marital estate. As long as the workplace continues to permit and even

[3] In Indiana, property is defined by statute in relevant part as "a present right to withdraw pension or retirement benefits" or "the right to receive pension or retirement benefits that are not forfeited upon termination of employment or that are vested (as defined in Section 411 of the Internal Revenue Code) but that are payable after the dissolution of marriage . . . ." Ind. Code Ann. § 31-9-2-98 (b) (1) and (2) (LexisNexis 2019).

[4] See, e.g., *Pelts* v. *Pelts*, 514 S.W.3d 455, 457 (Ark. 2017) (retirement benefit "contingent on continued employment is too speculative to be vested and subject to division").

D. S. *v.* D. S.

favor exchanges of salary for retirement benefits, there are substantial practical problems in treating only one side of the exchange (salary) as marital property.'' (Emphasis omitted.) Id., pp. 133–34.

Despite the foregoing authority, the majority relies on *Mickey* v. *Mickey*, supra, 292 Conn. 597, to conclude that the heart of the property inquiry is not whether retirement benefits should be available for distribution by trial courts in accordance with the equitable circumstances prevailing in any particular case but, rather, whether the holder of the benefit has or will ''[obtain] an enforceable right in the interest.'' Part I B of the majority opinion. The majority retreats from the ''nuanced approach'' that we adopted in *Bender* and returns to a ''traditional, fairly rigid'' definition of property; *Mickey* v. *Mickey*, supra, 625; concluding that the focus of the property inquiry ''is on the likelihood that the holder *eventually* will acquire an enforceable [legal] right in the interest, that is, whether the interest will likely vest or whether the holder will otherwise acquire a definitive right to it.'' (Emphasis in original.) Part I B of the majority opinion. The majority's conclusion is inconsistent with *Mickey* and our subsequent case law.

*Mickey* did not involve retirement benefits accrued during a marriage, which generally satisfy the statutory definition of property. Indeed, in *Mickey*, we explicitly reaffirmed the abiding principle that ''deferred compensation'' earned during a marriage ''assumes the qualities of an asset'' and, therefore, ''is distributable as marital property.'' *Mickey* v. *Mickey*, supra, 292 Conn. 632. Instead, the issue on appeal in *Mickey* was whether disability benefits resulting from injuries sustained after the end of a marriage satisfy the statutory definition of property. Id., 599. We held that ''*disability* benefits awarded under General Statutes § 5-192p as a result of a disability incurred *after* a marriage has been dissolved [do not] constitute distributable marital property under

D. S. *v.* D. S.

. . . § 46b-81.'' (Emphasis added; footnote omitted.) Id.; see id., 600. Our reasoning was twofold. First, disability benefits for an injury that occurred after the end of a marriage, unlike retirement benefits acquired during the life of a marriage, are too speculative at the time of the dissolution to constitute distributable marital property under § 46b-81. We reasoned that ''[a] potential disability is, by its very nature, an accidental event that every employee and employer strives to avoid. It is difficult to perceive how a property interest tied to such an occurrence is sufficiently concrete, reasonable and justifiable . . . to treat any benefits that *might* accrue, *if* the accident eventually occurs *and* is serious enough to cause permanent disability, as a presently existing property interest eligible for equitable distribution at the time of dissolution.'' (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 630. Second, ''[a] benefit derived from an injury occurring years after dissolution, meant solely to compensate for the loss of future wages, simply does not represent the fruits of the marital partnership that § 46b-81 is designed to equitably parse.'' (Internal quotation marks omitted.) Id., 631. Thus, we concluded that postdissolution disability benefits are not fruits of the marriage and do not constitute property. Nothing in *Mickey* requires deferred compensation acquired during the marriage to be or to eventually become vested or irrevocable.

The majority's conclusion also is inconsistent with our recent decision in *Tilsen* v. *Benson*, supra, 347 Conn. 758, in which we held that discretionary distributions from a family limited partnership constitute divisible marital property, even when there is no enforceable or definitive right to receive those distributions. See id., 804–807. The plaintiff in *Tilsen*, Jon-Jay Tilsen, was a limited partner in a family partnership that historically had made annual distributions to its partners, including

D. S. *v.* D. S.

Tilsen, but Tilsen had no role in the management of the business and no enforceable right to receive the discretionary distributions. See id., 764, 795, 804–805. We nonetheless determined that the distributions were property subject to equitable distribution under § 46b-81 in light of the trial court's "unchallenged findings that the parties have regularly received the . . . distributions since 1997 and have relied on them as part of their budget, particularly as a source of retirement savings." Id., 806 n.26. The distributions were a marital asset, and Tilsen's "interest in the . . . distributions [was], 'as a practical matter . . . sufficiently concrete, reasonable and justifiable as to constitute a presently existing property interest for equitable distribution purposes.' " Id.; see also id. (quoting *Bender* v. *Bender*, supra, 258 Conn. 749, and citing to *Mickey* v. *Mickey*, supra, 292 Conn. 628, among other cases, in support of this holding).[5] Our holding in *Tilsen* is consistent with

---

[5] The majority incorrectly characterizes this aspect of *Tilsen* as dictum and incorrectly states that I "[gloss] over the fact that this court never determined that the interest at issue in *Tilsen* was property." Part I C of the majority opinion. Our analysis of whether the discretionary distributions constituted property was not dictum. "Dictum includes those discussions that are merely passing commentary . . . those that go beyond the facts at issue . . . and those that are unnecessary to the holding in the case. . . . [I]t is not dictum [however] when a court . . . intentionally takes up, discusses, and decides a question germane to, though not necessarily decisive of, the controversy . . . . Rather, such action constitutes an act of the court [that] it will thereafter recognize as a binding decision." (Internal quotation marks omitted.) *Cruz* v. *Montanez*, 294 Conn. 357, 376–77, 984 A.2d 705 (2009). In *Tilsen*, we intentionally took up, discussed, and decided an issue germane to the case. Notably, the parties in *Tilsen* did *not* stipulate that the discretionary distributions satisfied the statutory definition of property in § 46b-81. To the contrary, Tilsen argued on appeal that the trial court improperly had categorized the distributions as property, and this court rejected that claim on the merits. See *Tilsen* v. *Benson*, supra, 347 Conn. 806 n.26. The parties stipulated that " 'the court shall have the right to make a determination as to what portion/percentage of such [partnership] distributions the [wife] is entitled.' " Id., 805. This stipulation recognized that the trial court had the authority to distribute the partnership distributions as part of its financial orders; it did not provide that those distributions were distributable as *property* (as opposed to alimony).

D. S. *v.* D. S.

"the theme running through this area of our jurisprudence, which . . . pays mindful consideration to the equitable purpose of our statutory distribution scheme, rather than to mechanically applied rules of property law. In order to achieve justice, equity looks to substance, and not to mere form." *Bender* v. *Bender*, supra, 751. The focus of the property analysis is not on eventual vesting per se; it is on the practical likelihood that the asset will be received and the nature of the asset in the context of the marital partnership.

Looking to the nature of the retirement payments at issue in this case, as our case law instructs, it is clear to me that they are a direct product of the parties' thirty-year marriage subject to equitable distribution under § 46b-81. The defendant, D. S., worked as a partner for her employer, a large international law firm, for twenty-three years prior to the dissolution of her marriage to the plaintiff, D. S. See footnote 6 of this opinion. The parties were married during all of those twenty-three years, and the retirement payments are deferred compensation for services rendered by the defendant while married. As such, the retirement payments plainly constitute the fruits of the parties' marital partnership. The fact that the retirement payments are unvested, noncontributory, and unfunded has no bearing on their inherent nature as marital assets because, regardless of the funding mechanism used to pay the benefits, they represent a trade-off of one type of marital property (current salary) in exchange for another type of marital property (future retirement benefits). See, e.g., *Mickey* v. *Mickey*, supra, 292 Conn. 632; *Bender* v. *Bender*, supra, 258 Conn. 754; *Krafick* v. *Krafick*, supra, 234 Conn. 794–95. To categorize the retirement payments as anything other than a divisible marital asset "would be to blink our eyes at reality." *Bender* v. *Bender*, supra, 752.

The record also establishes beyond any doubt that the defendant's expected receipt of the retirement pay-

D. S. *v.* D. S.

ments is not overly speculative. Contrary to the majority's suggestion, my assessment in this regard is not based on my disagreement with the trial court about the evidentiary facts. See part I C of the majority opinion. The facts are the facts, and, in my estimation, there simply is no factual basis to support the trial court's conclusion that the defendant is unlikely to receive retirement benefits from her employer when she retires. All of the evidence indicates that she almost certainly will receive those benefits. As the author of a leading treatise on family law, Brett R. Turner, observes, the Appellate Court's decision in this case "reached the wrong result. [Although] the amount of benefits likely to be received was difficult to predict in advance, there was no evidence suggesting that the [defendant] was likely to receive nothing." 2 B. Turner, Equitable Distribution of Property (4th Ed. 2024) § 6:22; see *D. S.* v. *D. S.*, 217 Conn. App. 530, 536–45, 289 A.3d 236 (2023).

First, the defendant *currently* is eligible to receive these payments under the *existing* partnership agreement. At the time of trial, the defendant testified that she was "currently eligible for [the retirement] benefits" and that, if she were to retire today, she "would be entitled to payments under the [firm's] partnership agreement . . . ." Although the retirement benefits do not mature until after the defendant retires, her retirement is anything but a speculative, distant, and unforeseeable event. To the contrary, the defendant, who was fifty-seven years old at the time of trial, testified that the average retirement age at the firm was sixty and that she planned to retire by age sixty-two "[a]t the latest . . . ." The amount of the benefits at issue, moreover, is anything but trivial; in 2016—when its profits per partner were significantly less than they were at the time of trial—the firm projected that, if the defendant retired in 2025, her retirement payments would be $1,458,000 annually.

D. S. *v.* D. S.

Second, the record demonstrates that the defendant's law firm has never once failed to make retirement payments to an eligible retired partner. Past performance may not guarantee future results, but the firm's decades long record of consistent performance, without exception, strongly indicates that the benefits are not "overly speculative" from the perspective of a soon to be retired senior partner such as the defendant. *Mickey* v. *Mickey*, supra, 292 Conn. 625; see *Tilsen* v. *Benson*, supra, 347 Conn. 806 n.26 (discretionary distributions from limited partnership were property subject to equitable distribution under § 46b-81 due to trial court's "unchallenged findings that the parties have regularly received the . . . distributions since 1997 and have relied on them as part of their budget, particularly as a source of retirement savings"). The realistic expectation of the receipt of the retirement payments was supported not only by the firm's past performance but also by its projected future earnings. There was no evidence presented at trial that the firm faced any realistic prospect of financial distress or insolvency in the foreseeable future. Quite the opposite is true; the firm historically is one of the most successful and prosperous law firms in the world, and the evidence at trial established that it was enjoying a period of increased profitability.[6] On this record, there is no reason to believe that the firm would have been unable to fund payments to retired partners.

[6] The parties agreed to various sealing orders in the trial court "on the basis that revealing certain information would be detrimental to one or more of the parties." *D. S.* v. *D. S.*, supra, 217 Conn. App. 532 n.1. The Appellate Court amended those sealing orders but, "in the spirit of the trial court orders and the parties' reliance on them, [did] not, in [its] opinion, refer to either party or their children by name . . . [or] identify any of the parties' past or present employers." Id., 532–33 n.1. The majority opinion follows suit, and I will not upset this arrangement by identifying the defendant's employer by name. I will observe, however, that the firm is among the most profitable law firms in the world, and anyone learning the identity of the defendant's employer would be shocked to hear that Connecticut courts have questioned the firm's financial future.

D. S. *v.* D. S.

Third, the pool of funds from which the retirement payments are made each year is capped at 30 percent of the firm's net profits, and the payment to each retired partner is capped at a specified percentage to further ensure that the ratio between the total retirement payments and the firm's net income is sustainable. These caps do not portend the cessation of the retirement payments; again, just the opposite is true. The caps are designed to ensure the *continued* fiscal health of the retirement program. As the evidence at trial demonstrated, in 2016, the firm presented a written report to the partnership, stating that it expected the caps to continue to maintain the fiscal stability of the firm over the next twenty-five years. The 2016 report, which the defendant herself presented to the partnership, expressly was intended to inform the partners what to expect of the firm's retirement plan over the next twenty-five years in light of the changes that had occurred over the past twenty-five years (primarily the firm's increased profitability and increased ratio of retired partners to active partners). "What does it mean for the [f]irm" and for "individual partners" over the next twenty-five years, asked the report. Its answer to the question was direct and unequivocal: "The cap will do what it is meant to do to avoid destabilizing the [f]irm." To ensure fiscal stability, the report warned that, "[o]ver the next [twenty-five] years, the [retirement] benefit cutback could be as much as 50 [percent] for partners with 10 [percent] caps." The report forecast a reduction in the amount of the retirement payments—it contains no suggestion, express or implied, that the retirement payments will be eliminated over the next twenty-five years.

Fourth, although it is true that the partnership agreement theoretically *could* be amended at some point in the future to terminate the firm's obligation to pay the retirement benefits altogether, the occurrence of such an amendment is pure speculation. There was no evidence

D. S. *v.* D. S.

that the partners ever have considered amending the partnership agreement to terminate the retirement payments, and it would not be easy to do so. Termination of the retirement payments would require a supermajority vote of at least three quarters of the partners having at least 75 percent of the points held by the equity partners. In the absence of any evidence indicating a realistic probability that a supermajority of the partners would coalesce to implement such a drastic and unprecedented change, the risk that these payments would be terminated rests on hypothetical conjecture without basis in fact.

To support its conclusion to the contrary, the majority relies heavily on the testimony of the defendant's expert witness, Mark Harrison. This reliance is misplaced because Harrison's opinion was based on nothing more than theoretical possibilities without any case-specific evidentiary support. Harrison read or paraphrased portions of the partnership agreement to the court and then speculated, with no factual basis, about possible future scenarios that may or may not one day occur. Harrison opined, for example, that the defendant's receipt of the retirement payments was speculative because the firm might one day become insolvent. However, this opinion had nothing to do with the firm's actual financial condition—Harrison acknowledged that he did not have access to the firm's financial records. Instead, his opinion was based solely on the fact that "twenty-two firms of almost [the same] size have disbanded or gone bankrupt since the financial crisis in 2007." After making this observation, Harrison was quick to add that "this is a wonderful firm. I don't want to make it sound like it's not. [It has] been around for a long time, and [it is] as top-shelf as they come." Understood in context, it is apparent that Harrison's opinion testimony was not based on any analysis regarding the probability that this specific firm was at risk of insolvency or bankruptcy but, instead, on the possibility

D. S. *v.* D. S.

that a generic firm of a similar size might one day go out of business.[7] Such hypothetical scenarios and theoretical possibilities fail to apply the proper analysis under *Bender* and its progeny.

Although Harrison characterized the retirement payments as "the epitome of a mere expectancy," this testimony was entitled to no weight. Whether the defendant's interest in the retirement payments was a mere expectancy or sufficiently concrete, reasonable, and justifiable to constitute distributable property under § 46b-81 was the ultimate legal issue to be decided by the trial court, not a factual issue on which an expert witness may opine. See, e.g., *Updike, Kelly & Spellacy, P.C.* v. *Beckett*, 269 Conn. 613, 652 n.30, 850 A.2d 145 (2004) (agreeing that expert testimony "amounted to an improper legal opinion on the ultimate issue in the case"); *Kelly* v. *Waterbury*, 96 Conn. 494, 499–501, 114 A. 530 (1921) (expert witness was not permitted to testify as to ultimate legal issue of defendant's negligence); *Fuller* v. *Metropolitan Life Ins. Co.*, 70 Conn. 647, 677, 41 A. 4 (1898) (expert testimony on "[t]he meaning and legal effect of the [insurance] policy" was inadmissible because that issue "was a question of law for the court"); 1 R. Mosteller et al., McCormick on Evidence (8th Ed. 2020) § 16, p. 168–69 ("at common law courts do not allow opinion on a question of law, unless the issue concerns foreign law" (footnote omitted)). To the extent that Harrison's opinion may be characterized as one of fact, it was devoid of the requisite case-specific evidentiary support. See, e.g., *Commissioner of Transportation* v. *Larobina*, 92 Conn.

---

[7] The majority seizes on Harrison's groundless conjectural musings about a financial collapse of the firm, but this aspect of Harrison's opinion has no value, and it would be clearly erroneous for a judge to rely on it in the present case without first learning much more about the past and present financial condition of the firm, as well as the various indicators of future performance used in the law firm industry, none of which was known to Harrison by his own admission.

D. S. *v.* D. S.

App. 15, 26, 882 A.2d 1265 ("[n]o weight may be accorded to an expert opinion [that] is totally conclusory in nature and [that] is unsupported by any discernible, factually based chain of underlying reasoning" (internal quotation marks omitted)), cert. denied, 276 Conn. 931, 889 A.2d 816 (2005); see also footnote 7 of this opinion. Harrison's expert testimony simply does not provide a basis to deem the likelihood of the defendant's receipt of the retirement payments overly speculative.[8]

To put the point directly, there is not a shred of factual evidence in this record to support a finding that there is a realistic possibility, much less a likelihood, that the defendant will be divested at any time in the foreseeable future of her current contractual right to receive the retirement payments. There is evidence to support a finding that her payments will be reduced between now and 2040 by as much as 50 percent, but, even with that reduction, her annual payments will approach $750,000 based on the firm's own projection.

In sum, the majority's legal determination that the retirement payments do not constitute marital property, as defined by § 46b-81, is unsupported by the factual record, inconsistent with our case law, and contrary to the legislature's intent "to expand the range of resources subject to the trial court's power of division . . . ."

_____

[8] I acknowledge that the retirement payments may be difficult, if not impossible, to value. Indeed, the trial court found that the value of the retirement payments could not be quantified at the time of trial and, therefore, was "a mere expectancy." As we explained in *Bender*, however, difficulties in valuation do not defeat the categorization of a marital resource as property under § 46b-81. See *Bender* v. *Bender*, supra, 258 Conn. 749–50 and n.7. For example, the trial court may account for the difficulties in valuation by awarding a percentage of the retirement payments instead of a lump sum or by distributing a portion of the retirement payments as alimony in lieu of property. See footnote 9 of this opinion. There are many tools at the trial court's disposal, but excluding the retirement payments entirely from the pool of marital assets subject to equitable division under § 46b-81 is not one of them.

D. S. *v.* D. S.

(Internal quotation marks omitted.) *Bender* v. *Bender*, supra, 258 Conn. 743. The majority's return to a traditional, rigid definition of property in § 46b-81—"defined solely by enforceable contract rights, to the exclusion of other interests that . . . are appropriately recognized as property within the marital context"—upsets settled precedent and is contrary to the legislative purpose animating our statutory scheme. Id., 753; see *Mickey* v. *Mickey*, supra, 292 Conn. 625. As Turner stated in his learned treatise, the rule adopted by the majority "poses a significant potential threat to the policy that retirement benefits earned during the marriage are marital property." 2 B. Turner, Equitable Distribution of Property (4th Ed. 2024) § 6:22. On the present factual record, the retirement payments plainly constitute marital property under § 46b-81, and, therefore, I would reverse the judgment of the Appellate Court upholding the decision of the trial court and remand for the entry of new financial orders.[9]

---

[9] I recognize that the trial court could have exercised its discretion to award a percentage of the retirement payments as alimony in lieu of property. See General Statutes § 46b-82 (a) ("[a]t the time of entering the decree, the Superior Court may order either of the parties to pay alimony to the other, in addition to or *in lieu of* an award pursuant to section 46b-81" (emphasis added)). To properly exercise its discretion, however, the trial court first must correctly categorize the retirement payments as property under § 46b-81. As we explained in *Krafick* v. *Krafick*, supra, 234 Conn. 783, "[§] 46b-81 requires a trial court to make an equitable distribution of the parties' *property*; to go about doing so sensibly, a court must determine at the outset which of the parties' resources are subject to division and assignment under that provision. Although § 46b-82 authorizes the trial court to award alimony 'in addition to or *in lieu of* [a distribution of property] pursuant to section 46b-81' . . . the trial court may decide to exchange alimony for property only *after* determining the value of the property in the estate." (Emphasis in original.) Id., 798 n.22.